No. 56,219

LENA BARNHART, *Appellee,* v. HENRY LEWIS McKINNEY and LILLIE MARIE McKINNEY, *Appellants.*

(682 P.2d 112)

Opinion filed April 27, 1984.

*Henry Lewis McKinney* argued pro se, and *John J. Immel*, of Petefish, Curran & Immel, of Lawrence, was on the brief for appellants.

*Thomas H. Sachse*, of Green & Sachse, Chartered, of Ottawa, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

HOLMES, J.: Defendants Henry Lewis McKinney and Lillie Marie McKinney, husband and wife, appeal from an order of the trial court granting summary judgment to Lena Barnhart, plaintiff/appellee, in an action by plaintiff to quiet her title to five acres of land in Franklin County. The facts, of necessity, must be set forth in some detail.

Lena Barnhart and her husband, Dewey Barnhart, owned a farm of approximately 151 acres in Franklin County which they occupied as their home. On December 11, 1971, they entered into a contract to sell the farm, including the home and other improvements, to Lawrence realtors John M. McGrew, Edgar R. Grosdidier, and Kenneth P. Callicott (hereafter referred to collectively as McGrew), who were associated with McGrew Real Estate, Inc. The land sold was described in the contract as:

"The NE fractional ¼ of Sec. 5, T16S, R18E; said tract containing approximately 151 acres less a tract to be more specifically described by an engineer's survey, said tract to be agreed upon by both parties (containing 5 acres more or less). *Said 5 acres are to be retained by Sellers as a site for a house trailer with the understanding that when Sellers decide to sell or vacate said 5 acres they will first offer it to Purchasers at a price not to exceed $200.00 per acre plus the cost of any permanent improvements to the real estate that have a residual value.* The property to be conveyed to Purchasers for the below mentioned consideration shall be not less than 145 acres." (Emphasis added.)

The purchase price was $34,500.00 with $27,000.00 of that amount to be carried by the sellers with interest at 7% per year and semi-annual payments of $1500.00 each. Deeds were executed by the Barnharts to the purchasers and placed in escrow, pursuant to the terms of the contract, with the Kansas State Bank of Overbrook, Kansas.

The contract was a printed form agreement furnished and prepared by the purchasers. The printed portion of the document contained, *inter alia*, the following:

"It is understood by the parties hereto that McGrew Real Estate, Inc., Law-

rence, Kansas, is the real estate agent representing the Seller in regard to the sale of the above described property and the commission due is to be paid by the Seller.

"It is mutually agreed that all the covenants and agreements herein contained shall extend to and be obligatory upon the heirs, executors, administrators and assigns of the respective parties."

Subsequently, the Barnharts installed a mobile home and other improvements on the 5-acre tract as contemplated by the contract. On April 17, 1972, McGrew sold 15 acres in the northwest corner of the property to a Mr. and Mrs. Frevert and retained the remaining 131.23 acres. The tract sold to the Freverts included the home and improvements formerly occupied by the Barnharts, who moved into the recently installed mobile home. Dewey M. Barnhart died May 16, 1974.

On July 1, 1975, McGrew entered into a contract to sell the remaining acreage to the defendants Henry Lewis McKinney and Lillie Marie McKinney. This contract was on a printed form identical to that used in the Barnhart sale and again was furnished and prepared by McGrew. The purchase price for the 131.23 acres was $39,000.00, and in the typewritten portion of that contract the parties agreed payment was to be made as follows:

"[U]pon approval of title, delivery of General Warranty Deed and possession of premises but in any event on or before but no later than August 1, 1975, *subject to an existing contract to Dewey M. Barnhart and Lena Barnhart in the approximate remaining balance of $18,754.95 which said contract* in its exact remaining balance as of date of possession shall be deducted from the purchase price and which *Purchasers hereby assume and agree to pay.* Interest on said mortgage shall be pro-rated as of date of possession. Payments on said contract are $1,500.00 semi-annually with an interest rate of 7%.

"*It is understood that Sellers will obtain written consent from Lena Barnhart for the assumption of said contract.*" (Emphasis added.)

A consent to this sale and assumption of the December 11, 1971, contract was prepared and obtained by McGrew. The letter of consent was addressed to McGrew and stated in its entirety:

"Please consider this letter my formal consent to release the three of you from any further liability *on your contract purchase of 151 acres, more or less,* in the Northeast fractional ¼ of Section 5, T16S, R18E, in Franklin County, Kansas.

"As I understand it, the three of you have sold the property to Henry Lewis McKinney and wife and that they will assume the existing contract balance of approximately $18,754.00 on or about August 1, 1975. *I consent to Henry Lewis McKinney and wife assuming the above contract dated December 11, 1971.* I

would, of course, expect them to make the payments promptly just as the three of you have.

Sincerely,

/s/ Lena Barnhart." (Emphasis added.)

For the next seven years, defendants made payments to Lena Barnhart as required by the two contracts.

In early June, 1982, plaintiff contacted Ken Callicott of the McGrew agency to sell her five-acre tract with improvements. In accordance with the December 11, 1971, contract plaintiff told Callicott to first offer the property to the McKinneys. This was done in a letter to Henry McKinney from Callicott dated June 4, 1982, which stated in part:

"*As per your contract with Lena she has instructed me to first offer the property to you* on the following basis:

| Land Value | $1,000.00 |
| Improvements: Two bedroom mobile home, storm cave, well, septic tank, carport, sheds and fence | 21,000.00 |
| | $22,000.00 Terms Cash |

"Lena would consider an installment contract sale on terms that would be acceptable to her. For an installment sale the price would be $26,000.00.

"Lewis if you are interested in the property please contact me. Lena would like to know by June 16, 1982 if you are interested." (Emphasis added.)

On June 15, 1982, Henry McKinney wrote back, denying that the mobile home, storm cave and carport were "permanent improvements to the real estate" as specified in the first contract. McKinney was of the opinion that the only additional permanent improvements to the land were the well, septic system, fence and storage shed. McKinney estimated the total cost of the land and these improvements to be $3,500 - 4,000, and said:

"I am willing to purchase the real estate and the four above listed permanent improvements for the $1000 for the five acres plus the cost of the specified four 'permanent improvements to the real estate that have a residual value.'

. . . .

"[T]he mobile home and contiguous integral structures would lose a sizeable part of their value if moved from their present location, so I would be willing in a separate contract to negotiate a fair price for the trailer plus car ports, storm shelter, etc. based to a large extent on the trade book price . . . .

"Possible purchase of the mobile home, and contiguous integral structures at an agreeable price is definitely contingent upon an unimpeded transfer of the five acres, well, septic system, fence, and storage shed as stipulated in our contract of Dec. 11, 1971.

"Furthermore, my contingent offer to purchase the mobile home and contigu-

ous structures if a fair price·can be mutually agreed on is good only for thirty days from the date of this letter.

"I believe I would prefer to pay cash for the land and permanent improvements to the real estate. The mobile home and contiguous integral structures, on the other hand, would be subject to mutual negotiation."

Plaintiff refused these terms, and on June 21, 1982, listed the five acres and all improvements with McGrew Real Estate, Inc. for sale to the public at a total price of $26,000. When the McKinneys learned of plaintiff's intention to sell her property on the open market notwithstanding the existing contracts, they filed an affidavit of equitable interest with the Franklin County Register of Deeds on June 24, 1982. This affidavit set forth the fact that defendants had purchased the 131.23 acres around plaintiff's five-acre tract, and that they were to first be offered these five acres at the specified price "when Seller decides to sell or vacate . . . ."

On December 3, 1982, plaintiff filed this action in·the district court of Franklin County seeking to quiet title to her property. In a second cause of action plaintiff alleged defendants knowingly and willfully filed a false affidavit of equitable interest, thereby slandering and defaming her title to the five acres and sought actual and punitive damages. Defendants answered that the affidavit was filed solely to protect their interests in the five acres, not to slander or impair plaintiff's interest. Defendants, in a counterclaim, sought to specifically enforce their contractual rights to purchase the five acres and further sought damages for plaintiff's breach of the agreements.

Plaintiff's reply to defendants' counterclaim denied that defendants, by their purchase of the adjoining land, received any interest in the five-acre tract and claimed instead the land "was specifically excepted from the sale." Plaintiff acknowledged her signature on the consent letter of July 2, 1975, but denied that letter was a consent to transfer or sell the five acres in question. She alleged defendants' counterclaim was barred by the statute of frauds, waiver, laches, and estoppel and:

"Further, the portion of the agreement between the Barnharts and McGrew, et al . . . relied upon by defendants in claiming some interest in the 5-acre tract, is void because it is in violation of the Rule against Perpetuities."

Both plaintiff and the defendants McKinney moved for summary judgment against each other. On August 10, 1983, the trial court rendered summary judgment for plaintiff. Relying on

*Henderson v. Bell,* 103 Kan. 422, 173 Pac. 1124 (1918), the court found that the "option agreement" contained in the 1971 contract was void as a violation of the rule against perpetuities. Defendants filed a motion for reconsideration, which was denied by the trial court on September 20, and have now appealed.

Defendants present three claims on appeal: (1) The trial court erred in holding that the 1971 contract violated the rule against perpetuities; (2) the 1975 sale to defendants in which they acquired their preemptive right to the five acres did not violate the Statute of Frauds; and (3) plaintiff's claim for slander of title should be dismissed. At this point we note once again certain standards governing summary judgment. Summary judgment is proper if no genuine issue of fact remains, giving the benefit of all inferences which may be drawn from the admitted facts to the party against whom judgment is sought. *McAlister v. Atlantic Richfield Co.,* 233 Kan. 252, Syl. ¶ 1, 662 P.2d 1203 (1983). When summary judgment is challenged on appeal, an appellate court must read the record in the light most favorable to the party who defended against the motion for summary judgment. *McAlister,* 233 Kan. 252, Syl. ¶ 4. In light of the narrow issue before this court neither party in this case contends that there are genuine issues of fact which remain unresolved. No discovery has been conducted and the matter was submitted upon the written documents and motions for summary judgment.

While numerous arguments are raised by the parties, the crux of the issues on appeal is whether the language in the December 11, 1971, contract, which reads:

"Said 5 acres are to be retained by Sellers as a site for a house trailer with the understanding that when Sellers decide to sell or vacate said 5 acres they will first offer it to Purchasers at a price not to exceed $200.00 per acre plus the cost of any permanent improvements to the real estate that have a residual value"

violates the rule against perpetuities. If it does, the trial court must be affirmed; if it does not, the trial court must be reversed.

The rule against perpetuities precludes the creation of any future interest in property which does not necessarily vest within twenty-one years after a life or lives presently in being, plus the period of gestation, where gestation is in fact taking place. *In re Estate of Freeman,* 195 Kan. 190, 195, 404 P.2d 222 (1965). Agreements creating an option to purchase real property and agreements creating a preemptive right to purchase real

property have both been recognized in Kansas as being subject to the rule against perpetuities. The distinction between an option and a preemptive right was described in *Anderson v. Armour & Company*, 205 Kan. 801, Syl. ¶ 1, 473 P.2d 84 (1970), where we held:

"A right of pre-emption differs from an option in that a pre-emption does not give to the pre-emptioner the power to compel an unwilling owner to sell, but merely requires the owner, when and if he decides to sell, to offer the property first to the person entitled to the pre-emption at the stipulated price, and upon receiving such an offer, the pre-emptioner may elect whether he will buy, and if he elects not to buy, then the owner of the property may sell to a third party."

The rule against perpetuities was first devised to prevent the practice of tying up family property for generations and thereby creating unreasonable restraints upon the alienation of property. The modern trend has been to limit the application of the rule whenever possible, especially in commercial transactions. One authority has stated:

"Excessively long family settlements were the threat which produced the Rule; and the perpetuity period was designed to fit the needs of family gift transactions. To derive from a rule thus motivated and thus formulated a general concept applicable to commercial transactions was a step of doubtful wisdom. Lives in being have no significance in commercial transactions, nor has the period of twenty-one years. Moreover, in accordance with standard perpetuities doctrine, when an option is held to be too remote the entire option is struck down, instead of only the excess beyond some permissible shorter period. This is unduly punitive on one party to the advantage of another who may be equally at fault. The usual case involves an option which the option-holder attempts to exercise within a very short period; the Rule against Perpetuities is seized upon by the owner to escape from his contract on the ground that the option-holder might have exercised the option too remotely—a situation which does not appeal to the common sense of business men or the ethical sense of anyone. Like the late lamented Statute of Frauds, the Rule becomes a destroyer of bargains which in all conscience ought to be performed." Morris and Leach, *The Rule Against Perpetuities*, p. 217 (1956).

In *Singer Company v. Makad, Inc.*, 213 Kan. 725, 518 P.2d 493 (1974), we recognized the modern trend in an action involving two "on completion" real estate leases involving proposed construction in two shopping center projects. No time was specified for the beginning of the term of each lease other than that the term would commence upon completion of construction of the premises. The lessee attempted to rescind the leases on the basis the beginning date for the term of the leases created an interest in real property which might not vest until some undesignated

time in the future which might be in violation of the rule against perpetuities. The court refused to apply the rule and, in doing so, held:

"The modern tendency is to temper the rule if possible where its harsh application would obstruct or do violence to an intended scheme of property disposition." Syl. ¶ 2.

"This court has been reluctant to extend the 'infectious invalidity' doctrine to situations where application of the rule against perpetuities was not needed to prevent remote dispositions of property." Syl. ¶ 3.

"The rule against perpetuities generally bears little relation to contemporary business practices or to the everyday world of commercial affairs." Syl. ¶ 4.

"A document should be interpreted where feasible to avoid the conclusion that it violates the rule against perpetuities." Syl. ¶ 6.

"Where no time has been fixed for the performance of an act to be done, the law implies that performance is to be accomplished within a reasonable time." Syl. ¶ 7.

In the instant case plaintiff has two basic contentions: (1) the language in the December 11, 1971, contract purporting to grant a right to purchase the 5 acres retained by plaintiff and her husband is void as violating the rule against perpetuities, and (2) the sale from McGrew to defendants did not include the 5 acres and did not involve any rights to purchase the 5 acres. Plaintiff asserts that as the printed portion of the contract provided that it "shall extend to and be obligatory upon the heirs, executors, administrators and assigns of the respective parties" plaintiff and her heirs or assigns might never decide to sell the property and might never vacate the property and therefore the possible time of vesting is so remote as to violate the rule. Defendants, on the other hand, contend that they purchased the 131.23 acres with the specific understanding that they were receiving all of the rights, as well as obligations, of the December 11, 1971, contract and that the right to purchase the 5 acres will vest, at the very latest, upon the death of Mrs. Barnhart. They contend the term "decide to sell or vacate" sets a time for performance which can be no later than the vacating of the premises by the death of the survivor of Dewey and Lena Barnhart.

In determining the issues before us, four documents are controlling: (1) The December 11, 1971, contract between the Barnharts and McGrew, (2) the July 1, 1975, contract between McGrew and defendants, (3) the July 2, 1975, letter from Mrs. Barnhart to McGrew, and (4) the June 4, 1982, letter from McGrew to defendant, Henry McKinney. In considering the first

argument of plaintiff that the December 11, 1971, contract violates the rule against perpetuities, the determination must be made as of the time the contract was executed and cannot be based upon subsequent events. If the interest created might possibly vest at some time beyond the period permitted then the rule is violated. *In re Estate of Freeman,* 195 Kan. 190, Syl. ¶ 2. In our consideration of plaintiff's second argument, we are of the opinion that under the facts of this particular case, the four documents must be read together to determine the intent of the parties. See *West v. Prairie State Bank,* 200 Kan. 263, 436 P.2d 402 (1968). In construing these four documents the cardinal rule is that each will be construed from the four corners of the document and that all provisions must be considered together and not in isolation. *Wiles v. Wiles,* 202 Kan. 613, 619, 452 P.2d 271 (1969).

The December 11, 1971, contract asserts that McGrew Real Estate, Inc., is the agent representing Mrs. Barnhart, yet McGrew, Grosdidier and Callicott, all purchasers under the contract, were associated with or principals in McGrew Real Estate, Inc. That contract specifically gives McGrew a preemptive right to purchase the 5 acres at such time as the Barnharts "decide to sell or vacate" the property. It is also clear that the contract contemplated retention of the 5 acres by the Barnharts only until such time as they might "decide to sell" the property or until such time as they vacated it. The property itself is an integral part of the overall acreage sold and the right to purchase the 5 acres at a later date was clearly an important provision of and part of the consideration for the contract. Was the right to delay the sale of the property or the vacation of the property one which could be passed on to the heirs and assigns of the Barnharts or was it personal to them? We think it was personal to the Barnharts and therefore the occurrence of either event would trigger McGrew's preemptive right of purchase well within a term not violative of the rule against perpetuities. See 61 Am. Jur. 2d Perpetuities § 61. It is abundantly clear that the 5 acres was merely "to be retained by Sellers as a site for a house trailer" and that at such time as the Barnharts had no further need for the property, it would become available to McGrew. Such a determination gives credence to all of the terms of the December 11, 1971, agreement and comports with the rule from *Singer Com-*

*pany* that a "document should be interpreted where feasible to avoid the conclusion that it violates the rule against perpetuities." At the very latest the property will be vacated upon the death of plaintiff which is well within the time necessary to avoid the application of the rule.

The trial court was of the opinion that *Henderson v. Bell,* 103 Kan. 422, was controlling in this case and that the December 11, 1971, contract did violate the rule against perpetuities. The plaintiff in *Henderson* sought to foreclose a mortgage given by defendant Bell on certain real property in Atchison County. Cross-petitions were filed among the various defendants, and Bell appealed that portion of the judgment requiring specific performance of a contract Bell had entered into with defendants Buchanan. In pertinent part that contract read:

" 'And it is also agreed that *should first parties [Bell] elect to sell* the following 40 acres now occupied by them, to-wit: The N.W. ¼ of the S.W. ¼ of Section 10-7-21, in Atchison County, Kansas, the second parties [Buchanans] shall have the right to purchase said last mentioned 40 at the agreed price of $65 an acre. It is further agreed that *if said parties [Buchanans] elect to sell* [the land actually purchased under the contract] *at any time in the future,* the first parties shall have the right to purchase same at the agreed price of $65 an acre, provided first parties will also buy the balance of the above described land at the agreed price of $40 an acre.' " *Henderson,* 103 Kan. at 423-24. (Emphasis added.)

In determining that the contract violated the rule against perpetuities, this court stated:

"By the contract, if Bell should elect to sell the property, he must first offer it to the Buchanans. The contract, if enforceable, gave to the Buchanans the right to purchase the property at some future, indefinite, unknown time; and Bell can be compelled to convey the property to the Buchanans at such time for the price named. Bell cannot sell the property to any person without first offering it to those holding under the contract. When sold under the contract, the property must be sold at $65 an acre, although at that time it may be worth $1,000 an acre. Bell does not have an absolute, uncontrolled right to sell the property at any time that he may see fit. It follows that the Buchanans and those holding under them, either as assignees or heirs, would hold a right to obtain an interest in the property running for an indefinite period of time. That right would be held in violation of the rule against perpetuities. [Citations omitted.]

"All the authorities do not hold in accordance with this rule. [Citation omitted.] But the rule announced appears to be supported by better reasoning, and is more consistent with sound public policy." *Henderson,* 103 Kan. at 424-25.

While we have no quarrel with the decision in *Henderson,* it is distinguishable from the case at bar in that there was no specified time of performance and, in fact, if the parties or their heirs

should not "elect to sell" the property then the triggering event controlling the preemptive right of purchase might never come to pass. In the present case the contract, when construed in its entirety, provides that "when Sellers decide to sell or vacate" the right of preemption is triggered. We are treated in the appellants' brief with a veritable treatise on the origin of and meaning of the words "when" and "vacate." Appellants state in their brief:

"The word 'when' in its primary, most general and common sense refers to time. For example, *as a noun* its meaning is essentially: 'what *time*,' 'which *time*,' 'the *time* of anything'; 'The *time* or moment of an event.' *As a pronoun:* 'what or which *time*.' *As an adverb*: 'at the *time* that,' 'At what *time*,' 'which *time*,' 'At which *time*,' 'After the *time* that.' " Citing *The American College Dictionary* (C. L. Barnhart ed. 1968); *Webster's New Collegiate Dictionary* (8th ed. 1980); *The American Heritage Dictionary of the English Language* (1978); *Funk & Wagnalls Standard College Dictionary* (1968); *Oxford American Dictionary* (1980); *Thorndike Barnhart Comprehensive Desk Dictionary* (C. L. Barnhart ed. 1957); *A Dictionary of the English Language* (Samuel Johnson 1755. Reprinted 1968).

Plaintiff, on the other hand, argued before the trial court and implies here that the word "when" should be read to mean "if" and therefore the triggering event may not come to pass until after the period proscribed by the rule against perpetuities.

As to the use of and meaning of the word "vacate," appellants make an exhaustive analysis of the origin and meaning of the word stating:

"Defendants have maintained all along that the word 'vacate' in the contract fixes the term of the preemptive right agreement beyond dispute. (R. 98-99) Numerous cases bearing on the subject appear in 91 C.J.S. and 43A W. & P. and they repeatedly establish that 'when one physically ceases to occupy premises due to death that one has indeed vacated.' As Words & Phrases clearly states: 'that is vacant which is without that which is filled or might be expected to fill it, that it has extensive reference to rights or possibilities of occupancy.' 43A W. & P. 482 citing *Standard Dictionary*. Appx. B, 12. See 'Empty.' *Ocean Fifth Realty Corp. v. Stern,* 109 N.Y.S.2d 92 (1951)."

Again plaintiff disputes the appellants' arguments and points out that if the parties had intended to make the preemptive right to purchase vest at their death, it would have been a simple matter to say so in the contract as was done in *Smerchek v. Hamilton,* 4 Kan. App. 2d 346, 606 P.2d 491 (1980). While the briefs of the parties are scholarly and enlightening we do not deem the interpretation of the contract as being so difficult as to require a determination based upon the technical origin of and application

of the words in question. In *Garvey Center, Inc. v. Food Specialties, Inc.*, 214 Kan. 224, 519 P.2d 646 (1974), we held:

"In placing a construction on a written instrument, reasonable rather than unreasonable interpretations are favored by the law. Results which vitiate the purpose or reduce the terms of the contract to an absurdity should be avoided. The meaning of a contract should always be ascertained by a consideration of all the pertinent provisions and never be determined by critical analysis of a single or isolated provision." Syl. ¶ 3.

While the present contract may be poorly worded, the intent of the parties appears clear and in accordance with our prior decisions that whenever possible a document should be construed to uphold its validity rather than defeat it, we hold the December 11, 1971, contract under the specific facts of this case does not violate the rule against perpetuities.

Having determined the December 11, 1971, contract to be valid, do the preemptive provisions inure to the benefit of the defendants? We think so. In July, 1975, McGrew desired to sell the 131.23 acres to defendants and as a part of the contract the defendants were to assume the outstanding balance on the Barnhart-McGrew contract. After setting forth the monetary terms, the contract, in a separate paragraph, stated:

"It is understood that Sellers will obtain written consent from Lena Barnhart for the assumption of said contract."

In compliance with those requirements, McGrew obtained a written consent from Lena Barnhart. The consent letter specifically referred to "your contract purchase of 151 acres" which indicates that all parties to the original December 11, 1971, contract contemplated that the entire acreage would eventually be sold to McGrew, not just 145 acres. In addition, after referring to the money balance due, Mrs. Barnhart stated, "I consent to Henry Lewis McKinney and wife assuming the above contract dated December 11, 1971." The consent was not limited to an assumption of the monetary terms of the original agreement but appears to apply to the "contract dated December 11, 1971" in its entirety.

In June of 1982, when plaintiff decided to sell the 5-acre tract, McGrew Real Estate, Inc., acting through Callicott as her agent, notified defendants "As per your contract with Lena she has instructed me to first offer the property to you . . . ." Plaintiff and McGrew recognized the preemptive right of the

defendants to purchase the property. Plaintiff asserts that the July 1, 1975, contract specifically excepted the 5-acre tract from the property to be conveyed by McGrew and therefore did not carry with it the preemptive right to purchase the 5-acre tract. Obviously McGrew could not convey the 5-acre tract at that time as plaintiff had neither decided to sell nor had she vacated the property. However, the agreement between McGrew and defendants did specifically provide for an assumption of the December 11, 1971, contract and when Mrs. Barnhart consented thereto and released McGrew from further liability, all the contractual rights and obligations devolved upon defendants. It is plain to us, when all the documents are construed together, that all parties in 1975 and again in 1982 recognized the preemptive rights of the defendants. Plaintiff's contentions that the December 11, 1971, agreement violates the rule against perpetuities and that the 1975 transaction with the defendants did not include any preemptive rights to the 5 acres are without merit.

While the foregoing disposes of the two principal issues on appeal, the plaintiff has raised two other contentions not determined by the trial court which, in view of the necessity for further proceedings, will be addressed briefly. First, plaintiff contends that the December 11, 1971, contract constitutes an unreasonable restraint on alienation because the $200.00 per acre figure is not realistic in today's market. While there is authority that a disparity in price due to subsequent inflation or market conditions may create an unreasonable restraint on alienation there is also authority to the contrary. 61 Am. Jur. 2d, Perpetuities § 121. In the instant case, plaintiff herself recognized the validity of the preemptive price, previously agreed upon, when she offered the property to defendants for the sum of $1,000.00 for the 5 acres of land. We find nothing unreasonable about the agreement fairly entered into between plaintiff and McGrew and subsequently adhered to in the sale from McGrew to defendants.

The other issue raised by plaintiff is that the defendants' claim is barred by the statute of frauds. K.S.A. 33-106 provides in pertinent part:

"No action shall be brought . . . upon any contract for the sale of lands, tenements, or hereditaments, or any interest in or concerning them . . . unless the agreement upon which such action shall be brought, or some memoran-

dum or note thereof, shall be in writing and signed by the party to be charged therewith . . . ."

In *Clark v. Larkin*, 172 Kan. 284, 239 P.2d 970 (1952), we held:

"A memorandum, in order to be enforceable under the statute of frauds, may be any document or writing, formal or informal, signed by the party to be charged or by his lawfully authorized agent, which states with reasonable certainty (*a*) each party to the contract either by his own name, or by such a description as will serve to identify him, or by the name or description of his agent, (*b*) the land or other subject matter to which the contract relates, and (*c*) the terms and conditions of all the promises constituting the contract and by whom and to whom the promises are made." Syl. ¶ 2.

The documents in question when construed in their entirety adequately meet the test of *Larkin* and we find the plaintiff's last two arguments to be without merit.

Finally, defendants ask this court to dismiss plaintiff's second cause of action seeking damages for slander of title. As this matter has never been ruled upon by the trial court, it is not properly before us on this appeal. However, from what has been said herein, it would appear obvious that upon remand the district court should make appropriate disposition of the claim.

The judgment of the trial court is reversed and the case remanded for further proceedings consistent with the views expressed herein.

HERD, J., concurring and dissenting: I respectfully dissent on the application of the rule against perpetuities and concur on all else in the majority opinion. I am unable to distinguish this case from *Henderson v. Bell*, 103 Kan. 422, 173 Pac. 1124 (1918). As correctly stated in the majority opinion we must consider a questioned document at the time of its execution to determine the applicability of the rule against perpetuities. This rule of construction precludes the use of the other documents, as relied upon herein to distinguish this case from *Henderson*. Where a contract expressly binds the parties, their heirs, executors, administrators and assigns, such words as "when Sellers decide to sell or vacate" must apply to the sellers, their heirs, executors, administrators and assigns. I find no authority for holding the death of a real estate title holder vacates his land, in a legal sense.

The rule against perpetuities is a well-established rule of property and should not be summarily amended or abrogated.

Many real estate titles are based upon it. Stability of real estate titles is important; in fact, more important than doing equity in one case.

The precedent established by this opinion will be difficult for trial judges to follow and practicing attorneys to use in that it eliminates the rule of law and substitutes some new equitable principles. Equity, like beauty, is in the eyes of the beholder, and should therefore be used only under established rules. I find none of those rules here.

I would affirm the trial court.