**Michael A. HART, Plaintiff,**

v.

**SPRINT COMMUNICATIONS COMPANY, L.P., Defendant.**

**No. 94–2036–JWL.**

United States District Court, D. Kansas.

Dec. 5, 1994.

Frank D. Menghini, Joseph W. Hemberger, Douglas M. Greenwald, McAnany, Van Cleave & Phillips, P.A., Kansas City, KS, William F.C. Skinner, Jr., Decatur, GA, for plaintiff.

R. Lawrence Ward, Philip W. Bledsoe, Shughart, Thomson & Kilroy, Kansas City, MO, Donnamarie Landsberg, U.S. Sprint Communications Co., Kansas City, MO, Harry J. Winograd, Bodker, Ramsey & Andrews, Atlanta, GA, for defendant.

### MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

### I.  Introduction

In this case, plaintiff Michael A. Hart, a former employee of defendant Sprint Communications Company ("Sprint"), has brought an action against Sprint for monies that plaintiff contends he was entitled to receive pursuant to incentive plan compensation agreements that governed his earnings while under Sprint's employ, and which Sprint has not paid.  The matter is currently before the court on Sprint's motion for summary judgment (Doc. # 44).  For the reasons set forth below, Sprint's motion is granted and Sprint is granted summary judgment on all of plaintiff's claims.[1]

### II.  Factual Background

Plaintiff is currently and has been at all relevant times a resident of Atlanta, Georgia. From approximately January of 1989 until August 26, 1993, plaintiff was employed in Sprint's Atlanta, Georgia office as a sales representative.

While employed at Sprint, plaintiff's compensation was determined according to the terms of Revenue Growth Incentive Compensation Plans ("Incentive Compensation Plans") which were executed by plaintiff and Sprint on a yearly basis.  Plaintiff executed

---

1. Sprint's motion for judgment on the pleadings as to Count III (Doc. # 46) is also currently pending.  Because the court finds that Sprint is entitled to summary judgment on that claim, the court finds the second motion to be moot.

new Incentive Compensation Plans for the years 1989, 1990, 1991, 1992 and 1993.

In 1989, plaintiff was employed as a sales representative in the Business Market Group ("BMG") of Sprint. BMG serviced middle range accounts which did not require a Virtual Private Network ("VPN") program. Large accounts requiring VPN service were routinely assigned to the National Accounts Division ("NAD"), which serviced a select list of large accounts. When plaintiff first began working at Sprint, there was no monetary incentive for BMG sales representatives to identify large accounts which the BMG would be unable to service. Such accounts would automatically be transferred to NAD, and BMG sales representatives would receive no compensation. In an effort to remedy this situation, Sprint instituted a joint sales policy which provided that BMG sales representatives would receive compensation for their efforts in successfully landing large accounts, even though those accounts would eventually be serviced by NAD.

Each BMG sales representative had a territory of customers that was not geographical, but instead consisted of a list of customers. First Financial Management Corporation ("FFMC") was on plaintiff's active list of accounts in 1989. While servicing the FFMC account on a regular basis, plaintiff learned from FFMC's director of telecommunications of FFMC's desire to nationalize its services. Plaintiff learned that FFMC planned to issue requests for proposals (RFP) to different telecommunications companies, but that Sprint was not included among those companies. Plaintiff was instrumental in securing a RFP for Sprint, which allowed Sprint to bid on the nationalized FFMC account. The account was identified by Sprint as a potential VPN account. Through the joint efforts of the BMG and NAD divisions, FFMC ultimately signed a three-year contract with Sprint for the nationalized account in August of 1989. The FFMC account turned into an extremely profitable one for Sprint, generating revenue over the life of the three year contract in the millions of dollars.

Under the terms of plaintiff's 1990 Incentive Compensation Plan (the "1990 Plan")[2], plaintiff's total compensation consisted of three components.[3] These three components are defined in the 1990 Plan as base salary, revenue-based incentive compensation and performance-based incentive compensation. As the name implies, the base salary is a set amount received by each sales representative. Various factors influence the amount of base salary to be received, including job category, geographic location and performance. The 1990 Plan states that the base salary "is intended as total compensation for all sales made by the Participant while he/she is employed by US Sprint" and that the base salary "provides a level of income security."

In describing incentive compensation, the 1990 Plan states that "[i]ncentive compensation is based on revenues generated from the Participant's sale of US Sprint products and services" and "is intended to be an incentive to the Participant to continue in the employ of US Sprint and not as compensation for sales made." The Plan provides that revenue-based incentive compensation is "based on the increase in average net usage invoice amounts as recorded in CIS [Customer Information System] for each account assigned to the territory from the territory base measurement and is pro-rated to reflect the actual number of days the Participant occupied the territory in the measurement quarter." The Plan defines performance-based incentive compensation as "an additional incentive compensation payment which may be payable when specified performance-based objectives are attained." A participant is eligible for performance-based incentive compensation when the "cumulative revenue growth amount reaches various performance objectives."

As Sprint began to receive revenues under the FFMC contract, plaintiff was paid incentive compensation pursuant to the terms of the 1990 Plan. During 1990, Ray O'Brien,

---

2. The 1990 Revenue Growth Territory Incentive Plan is made a part of the record as Exhibit 1 attached to Sprint's motion for summary judgment.

3. For reasons set forth in the discussion section of this order, the court has determined that plaintiff's 1990 Plan is the relevant document at issue for the purposes of this controversy.

then president of the Business Market Group of Sprint, determined that the BMG incentive compensation for the FFMC account should be discontinued following the third quarter of 1990. This decision was made due to Sprint management's belief that payment through the third quarter of 1990 would accurately reflect the involvement of plaintiff and others within BMG regarding the FFMC account. Pursuant to the growth of the FFMC account and the terms of the 1990 Plan, plaintiff received incentive compensation through the third quarter of 1990 in the amount of $192,407.41. Plaintiff has received no incentive compensation relating to the FFMC account since that time.

Plaintiff contends that his right to receive incentive compensation relating to the FFMC account was "earned" at the time the sale to FFMC was finalized and the contract with FFMC was executed. Sprint, on the other hand, contends in its motion for summary judgment that, pursuant to the terms of the 1990 Plan, it retained discretion to terminate plaintiff's incentive compensation relating to the FFMC account in the manner in which it did and the plaintiff therefore has no contractual or statutory claim for the continuing incentive compensation he is seeking in this lawsuit.

### III. Summary Judgment Standards

█ A motion for summary judgment gives a judge an initial opportunity to assess the need for a trial without weighing the evidence or determining credibility. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The requirement of a "genuine" issue of fact means that the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that

one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. at 2512.

█ The party who files a motion for summary judgment has the initial burden of demonstrating the absence of a genuine issue of material fact concerning its claims. This burden may be met by showing that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to show that there is a genuine issue of material fact left for trial. *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514. The nonmoving party may not simply rest on its pleadings in the case but has the affirmative duty to come forward with facts to establish that a genuine issue exists necessitating a trial in the case. *Id.* Thus, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Id.* The court must consider the record in the light most favorable to the party opposing the motion. *Bee v. Greaves,* 744 F.2d 1387, 1396 (10th Cir.1984), *cert. denied,* 469 U.S. 1214, 105 S.Ct. 1187, 84 L.Ed.2d 334 (1985). More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex,* 477 U.S. at 327, 106 S.Ct. at 2555.

### IV. Discussion

#### A. Which Compensation Plan is Applicable to the Current Controversy?

The first question this court must address is which compensation plan's terms are applicable to the current controversy. Sprint contends that although the FFMC contract was executed during 1989, plaintiff's entitlement to compensation in connection with the FFMC account is governed by the 1990 Plan. Sprint bases its argument on paragraph XVI of the 1990 Plan, which provides that:

> The effective date of this Plan is January 1, 1990, and the provisions of this Plan supersede and take precedence over those

contained in any prior Plans, addenda and/or exhibits thereto. The Plan will remain in effect until amended, modified, withdrawn or superseded.

Plaintiff contends that the language of paragraph XVI does not purport to apply the 1990 Plan to sales made under the 1989 Plan or other prior plans. Instead, plaintiff argues that the language should be interpreted to mean only that sales made subsequent to the enactment of the 1990 Plan are governed by the 1990 Plan, nothing more. In support of his interpretation, plaintiff argues that Sprint's interpretation would nullify the express provisions of paragraph XII of the 1990 Plan, which provides that:

Sales Representatives that were participating on December 31, 1989, in the [1989 Plan], and who are participating in the [1990 Plan], will receive compensation for any sale with an order date in CIS prior to January 1, 1990 in accordance with the payment rates contained in the [1990 Plan].

The construction and effect of contracts "is a question of law to be determined by the court." *First Hays Banshares, Inc. v. Kansas Bankers Sur. Co.*, 244 Kan. 576, 586, 769 P.2d 1184, 1191 (1989).[4] The interpretation of an unambiguous contract is a judicial function. *Missouri Pacific R. Co. v. Kansas Gas and Elec. Co.*, 862 F.2d 796, 799 (10th Cir.1988) (applying Kansas law). If the language of the contract is ambiguous, however, evidence is admissible to determine the intent of the parties to the contract, which is an issue of fact. *See Wood River Pipeline Co. v. Willbros Energy Services Co.*, 241 Kan. 580, 738 P.2d 866, 869 (1987) (*quoting Hall v. Mullen*, 234 Kan. 1031, 678 P.2d 169 (1984)). Whether or not the language of a contract is ambiguous is a question of law for the court to resolve. *Carland v. Metropolitan Life Ins. Co.*, 935 F.2d 1114, 1120 (10th Cir.1991) (applying Kansas law); *Simon v. National Farmers Organization, Inc.*, 250 Kan. 676, 829 P.2d 884, 888 (1992).

To be ambiguous, the contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from the natural and reasonable interpretation of its language. An ambiguity does not appear until application of pertinent rules of interpretation to the face of the instrument leaves it generally uncertain which one of two or more meanings is the proper meaning. *All West Pet Supply Co. v. Hill's Pet Products Div., Colgate–Palmolive Co.*, 840 F.Supp. 1433, 1439 (D.Kan.1993); *Farm Bureau Mut. Ins. Co. v. Old Hickory Cas. Ins. Co.*, 248 Kan. 657, 810 P.2d 283, 285–86 (1991). A written contract is not ambiguous unless two or more meanings can be construed from the contract provisions themselves. *Albers v. Nelson*, 248 Kan. 575, 578, 809 P.2d 1194 (1991).

The court concludes that the language of the 1990 Plan in this case is not susceptible to two different meanings with regard to whether the 1990 Plan or 1989 Plan governs plaintiff's entitlement to incentive compensation from the FFMC account. The 1990 Plan clearly provides that the provisions of that Plan "supersede and take precedence over those contained in any prior Plans, addenda and/or exhibits thereto." There is nothing doubtful or conflicting about this language. In fact, a clearer expression of intent that the 1990 plan was to take total precedence over previous plans would be difficult to imagine.

Further, the court does not agree with plaintiff's assertion that this interpretation of the language in paragraph XVI "nullifies" the language contained in paragraph XII. Paragraph XII merely provides that sales representatives are to receive compensation for any sale with an order date prior to January 1, 1990 in accordance with the payment rates contained in the 1990 Plan. It is true that this result could be inferred from the fact that the 1990 Plan supersedes the 1989 Plan, thus making the language in paragraph XII surplusage. However, without paragraph XII, the payment rate that applied to pre–1990 sales could have been a source of confusion. The court does not believe that the presence of the clarifying language in paragraph XII operates to make

4. The parties agree that Kansas contractual interpretation law applies based on the choice of

law provisions contained in paragraph XV of the 1990 Plan.

the plain, straightforward language of paragraph XVI ambiguous. A court may not rewrite a contract under the guise of construction. *Davenport v. Dickson,* 211 Kan. 306, 507 P.2d 301 (1973). Were the court to ignore the plain meaning of the language of paragraph XVI and accept plaintiff's argument of an ambiguity, the court believes it would in fact be rewriting the contract.

### B. Did the terms of the 1990 Plan give Sprint discretion to terminate Plaintiff's incentive compensation?

Having determined that the 1990 Plan applies to determine what compensation plaintiff is entitled to receive from the FFMC account, the crucial question this court must determine is whether, pursuant to the terms of that plan, Sprint was entitled to terminate plaintiff's incentive compensation derived from the FFMC account. In support of its argument that the terms of the 1990 Plan gave it discretion to terminate plaintiff's incentive compensation, Sprint relies principally on paragraph XIV(A), which provides as follows:

[Sprint] reserves the right to make any adjustments or revisions to products or services, base salaries, incentives, territories, or any other matter affecting an individual's employment at any time without prior notice. [Sprint] reserves the right to modify or terminate the Plan at any time; to assign the participant to another Plan, to remove the participant from eligibility under this Plan, and to add to, delete or change territory assignments at any time without prior notice. Previous year-to-date earnings will not be impacted by such changes except as indicated herein.

■ This paragraph, read in isolation, seems to give Sprint the right to exercise unfettered discretion to determine an appropriate level of compensation, which would include the right to terminate plaintiff's incentive income relating to the FFMC account. In particular, the first sentence of the paragraph, which provides in pertinent part that Sprint "reserves the right to make any adjustments or revisions to ... incentives ... at any time without prior notice," appears to be an unambiguous reservation by Sprint of discretion to determine plaintiff's incentive compensation. However, plaintiff argues that the paragraph is ambiguous as to whether it gives Sprint the "right to retroactively change the amount of compensation due for a previously made sale." Plaintiff contends that the paragraph can be read in a manner that would allow Sprint to make prospective changes in incentive compensation for future sales, but that as to past sales Sprint could not alter the amount of incentive compensation because plaintiff's right to that incentive compensation was "earned" at the time the sales were made.[5]

■ The meaning of a contract should not be determined from looking only at a single or isolated provision. *Christie v. K–Mart Corp. Employees Retirement Pension Plan,* 784 F.Supp. 796 (D.Kan.1992). In construing a written contract, language used anywhere in the contract should be considered and construed in harmony with all provisions. *Wood River Pipeline Co. v. Willbros Energy Services Co.,* 241 Kan. 580, 738 P.2d 866 (1987). A contract must be construed from its four corners, and all provisions must be construed together and not in isolation. *Barnhart v. McKinney,* 235 Kan. 511, 682 P.2d 112 (1984). Accordingly, in order to determine whether paragraph XIV(A) gave Sprint discretion to change the amount of compensation plaintiff would receive as a result of revenues derived from the FFMC account, it is necessary for the court to inter-

---

**5.** Plaintiff argues that the well known rules of construction that contracts drafted by one of the parties should be strictly construed against the party that drafted it and that ambiguous language should be construed liberally toward the nondrafting party mandate a finding that the language of the 1990 Plan is ambiguous. *See Thomas v. Thomas,* 250 Kan. 235, 244, 824 P.2d 971 (1992); *Desbien v. Penokee Farmers Union Co-op. Ass'n.,* 220 Kan. 358, 363, 552 P.2d 917 (1976). However, the court does not believe those rules of construction mandate a finding that the language is ambiguous in this instance. The rule that ambiguities within a contract are to be construed against the preparer is applied only where the contract is still ambiguous after the ordinary rules of construction are applied. *See First Nat. Bank of Olathe v. Clark,* 226 Kan. 619, 602 P.2d 1299 (1979). In this case, the court finds that following application of the ordinary rules of construction, the terms of the 1990 Plan are not ambiguous.

pret the meaning of the paragraph from the contract as a whole. From a reading of the contract as a whole, the court finds that it is unambiguous that plaintiff's right to incentive compensation did not vest at the time of sale, but rather plaintiff's right to continuing incentive compensation was triggered by revenues collected by the company and was contingent on a number of factors. Accordingly, the court finds that, based on the unambiguous language contained in paragraph XIV(A), Sprint had discretion to adjust an individual participant's incentive compensation, including the ability to terminate an individual's incentive compensation even after the date of the sale which generated the revenues on which the compensation was to be paid.

As a starting point, the court looks at paragraph III(B), which provides that:

Incentive compensation is intended to be an incentive to the Participant to continue in the employ of US Sprint and not as compensation for sales made. Incentive compensation is based on revenues generated from the Participant's sale of US Sprint products and services.

The language of this paragraph purports to set out the parties' intent that incentive compensation is not based on sales made, but rather is based on revenues generated by Sprint. That this is indeed the case becomes clear when other language in the 1990 Plan is analyzed. For example, under the definition of Base Salary in paragraph III(A), it states that Base Salary "is intended as total compensation for all sales made by the Participant while he/she is employed by US Sprint." The court finds it instructive that, under this language, base salary is intended to be compensation for sales made by a participant, rather than for a participant's work in attempting to make sales. This indicates that incentive compensation must be based on something other than sales made.

Further support for this interpretation is found in paragraph V, which sets forth the basis for payment of incentive compensation. Language in that paragraph provides that "[q]uarterly revenue-based incentive compensation is based on the increase in average net usage invoice amounts as recorded in CIS for each account assigned to the territory from the territory base measurement amount and is pro-rated to reflect the actual number of days the Participant occupied the territory in the measurement quarter." This language clearly indicates that incentive compensation is not due until revenue is received and contemplates continued triggering of payments after an initial sale based not on the sale itself but rather on increases in revenue received by Sprint.

Finally, the court finds that a number of provisions in the 1990 Plan provide that upon the occurrence of various conditions a plan participant's rights to incentive compensation will be discontinued. Paragraph VII(A) provides that if a participant is transferred from his or her territory, he or she will receive incentive compensation payments for net usage revenue growth from both territories pro-rated to reflect the actual number of days each territory was occupied in the quarter. If a participant's rights to incentive payments vested at the time he or she made a sale, this provision would make no sense. The same is true of paragraph IX, which provides that a participant who leaves a territory and is not assigned a new territory is entitled to an incentive payment for all net usage revenue growth generated in his or her former territory pro-rated to reflect the actual number of days the territory was occupied in the quarter. Additionally, paragraphs X and XI of the 1990 Plan provide for the suspension and/or elimination of incentive compensation when a participant takes a personal leave of absence, suffers a short-term disability, or is terminated from the company. None of these provisions are consistent with an interpretation that a participant's rights to incentive compensation vests at the time of sale.

■ Plaintiff makes an additional argument that the language contained in paragraph XIV is ambiguous as to whether it gives Sprint the right to adjust an individual's incentive compensation, as it did with plaintiff, or whether it merely gives Sprint the right to make adjustments to the Plan as a whole, affecting all participants. However, the court believes that the language is not ambiguous in giving Sprint the ability to

adjust an individual participant's compensation. While the second sentence of paragraph XIV(A) refers to Sprint's ability to modify or terminate the Plan, the first sentence makes no reference to the Plan as a whole. Rather, it provides that Sprint reserves the right to "make any adjustments or revisions to ... incentives...."

When the 1990 Plan is interpreted as a whole, the court finds that the language contained in paragraph XIV(A) is not ambiguous, and that it gives Sprint discretion to adjust an individual participant's incentive compensation. This discretion would include the ability to terminate an individual's incentive compensation, as happened in this case.

■■■ Plaintiff makes an additional argument that Sprint acted "arbitrarily and capriciously" in terminating his incentive compensation relating to the FFMC account and therefore, presumably, Sprint's termination violated an implied good faith provision of the 1990 Plan. The court finds this argument has no merit. As discussed above, the court has determined that the provisions of the 1990 Plan gave discretion to Sprint to terminate plaintiff's incentive compensation. When a contract grants or reserves discretion to one party, the other party cannot legitimately maintain a reasonable expectation that such discretion or judgment will not be exercised. *See Flight Concepts Ltd. Partnership v. Boeing Co.,* 819 F.Supp. 1535, 1551 (D.Kan.1993), *aff'd* 38 F.3d 1152 (10th Cir. 1994).

**6.** The parties disagree as to whether the Kansas Wage Payment Act applies to this dispute. Sprint argues that the choice of law provision contained in paragraph XV of the 1990 Plan, which provides that the Plan "shall be construed for all purposes in accordance with the laws of the state of Kansas," operates only to provide that Kansas common law rules of contractual construction shall apply to the Plan, and does not operate to include Kansas statutory law such as the Wage Payment Act. Plaintiff, on the other hand, argues that the broad language of the paragraph operates to include Kansas statutory law. Because the court finds that, in any event, plaintiff's claim under the Kansas Wage Payment Act fails, the court finds it unnecessary to decide whether paragraph XV makes the Act applicable to the present controversy.

**7.** K.S.A. 44–315(a) provides that:

## C. Plaintiff's Kansas Wage Payment Act Claim

■■■ Count III of plaintiff's complaint is a claim that Sprint's termination of his incentive compensation based on the FFMC account violated provisions of the Kansas Wage Payment Act, K.S.A. 44–313 *et seq.*[6] Specifically, plaintiff contends that the incentive compensation pursuant to the FFMC account constituted "earned wages," as defined by the Act, and that Sprint's termination of the incentive compensation and failure to pay him that compensation before he left Sprint's employ violated K.S.A. 44–315(a).[7]

■■■ In interpreting K.S.A. 44–315(a), Kansas law provides that although an employer is permitted to impose a condition precedent on its obligation to pay an employee wages, once an employee's right to earned wages becomes absolute, a condition subsequent cannot impose a forfeiture. *Weir v. Anaconda Co.,* 773 F.2d 1073, 1084 (10th Cir.1985) (applying Kansas law). In determining whether a wage is earned, a court's task is "one of deciding whether the documents drafted by the employer place a condition precedent on entitlement to the [wage] or whether they attempt to impose a forfeiture." *Id., quoting Morton Bldgs., Inc. v. Department of Human Resources,* 10 Kan. App.2d 197, 695 P.2d 450, 453 (1985).

As the court discussed earlier in this order, the terms of the incentive compensation plan did not provide that plaintiff's right to incentive compensation from the FFMC account became absolute at the point of sale.[8] Rath-

Whenever an employer discharges an employee or whenever an employee quits or resigns, the employer shall pay the employee's earned wages not later than the next regular payday upon which he or she would have been paid if still employed.

**8.** Plaintiff relies on *Smith v. MCI Telecommunications Corp.,* 755 F.Supp. 354 (D.Kan.1990), in support of his argument. However, the court finds *Smith* distinguishable from the present case. In *Smith,* the court found that under the express terms of the contract, the right to commissions became absolute at the time the service was sold. *Id.* at 359. In the present case, this court found that the right to incentive compensation did not become absolute at the time of the FFMC sale.

858

er, the incentive compensation was based on revenue growth and tied to other conditions precedent. Accordingly, the court finds that Sprint's termination of plaintiff's incentive compensation, pursuant to the terms of the plan, would not violate the Kansas Wage Payment Act.

## V. *Conclusion*

**IT IS, THEREFORE, BY THE COURT ORDERED THAT** defendant Sprint's motion for summary judgment (Doc. # 44) is granted.

**IT IS FURTHER ORDERED THAT DEFENDANT** Sprint's motion for judgment on the pleadings (Doc. # 46) is moot.

**IT IS SO ORDERED.**