(234 P.3d 833)
No. 102,115

M WEST, INC., *Appellant,* v. OAK PARK MALL, L.L.C., and CINGULAR WIRELESS, L.L.C., *Appellees.*

Opinion filed June 18, 2010.

*Mark D. Murphy* and *Jeffrey M. Cook*, of The Murphy Law Firm, LLC, of Overland Park, for appellant M West, Inc.

*Lynn S. McCreary*, of Bryan Cave LLP, of Kansas City, Missouri, and *Sarah N. Swatosh*, of the same firm, of St. Louis, Missouri, for appellee Cingular Wireless, L.L.C.

*Kathryn G. Lee, Amber Van Hauen*, and *Kara S. Bemboom*, of Husch Blackwell Sanders LLP, of Kansas City, Missouri, for appellee Oak Park Mall, L.L.C.

Before LEBEN, P.J., GREEN and CAPLINGER, JJ.

GREEN, J.: M West, Inc. (M West), appeals from the trial court's judgments granting summary judgment to Cingular Wireless, L.L.C. (Cingular), and to Oak Park Mall, L.L.C. (Oak Park). M West and Cingular were both tenants of Oak Park. Cingular and M West entered into a proposed assignment agreement for M West to take over Cingular's lease contingent upon Oak Park's consent of the assignment and the execution of a formal binding written assignment agreement. As required by its lease, Cingular requested Oak Park's approval of the assignment and outlined the consideration that would be paid to M West for the assignment. Despite Oak Park's indications to M West that it liked the idea of Cingular assigning its lease and that it was considering the proposed assignment agreement, Oak Park entered into negotiations with Cingular for termination of its lease in exchange for a cash payment. Oak Park ultimately rejected Cingular's proposed assignment of its lease to M West and allowed Cingular to terminate its lease in exchange for a $400,000 payment.

M West sued both Cingular and Oak Park and raised breach of contract claims. In addition, M West made a claim against Oak Park for tortious interference with a prospective business advantage or relationship. In granting summary judgment to Cingular and Oak Park, the trial court determined that no binding contract existed between Cingular and M West, that the statute of frauds was not satisfied, and that the evidence failed to support M West's tortious interference claim.

We determine that the trial court erred in its decisions. First, in regard to M West's claims against Cingular, the appellate record establishes that the communications between the parties met the statute of frauds. Moreover, in looking at the record in the light most favorable to M West, we determine that there existed a genuine issue of material fact as to whether the communications between M West and Cingular evidenced the existence of a binding contract with conditions precedent to *performance* under the contract or only preliminary negotiations with conditions that had to be met before *formation* of the contract. Importantly, if a binding

contract existed between Cingular and M West, Cingular could be held liable to M West if it is found that Cingular did not act in good faith with regard to the contract or hindered, delayed, or prevented the happening of the condition precedents for the purpose of avoiding performance of the contract. Because these are issues of fact, we determine that the trial court erred in granting summary judgment to Cingular.

Moreover, based upon the nature of the relationship between Cingular and M West, the viability of M West's tortious interference claim against Oak Park is dependent upon whether there is a binding contract between Cingular and M West. If it is found that a binding contract existed between Cingular and M West, then there is evidence in the present appellate record to create a genuine issue of material fact as to whether Oak Park engaged in intentional misconduct which was unjustified and malicious. As a result, we determine that the trial court improperly granted summary judgment to Oak Park on M West's tortious interference claim. Accordingly, we reverse and remand for further proceedings.

Cingular was a tenant in Oak Park under a 10-year lease agreement signed in April 2004. In early 2006, with approximately 8 years remaining on its lease agreement with Oak Park, Cingular began communicating with M West regarding an assignment of its lease agreement. M West owned Charlotte & Tipit, a fine jewelry store located at Oak Park, and was looking for a larger store space.

Under Cingular's lease agreement with Oak Park, before Cingular could assign its lease to another entity, Cingular had to obtain Oak Parks' consent to the assignment agreement:

"Section 16.01. Consent Required.

"(A) Tenant shall not voluntarily, involuntarily or by operation of law assign or encumber this Lease, in whole or in part, nor sublet all or any part of the Leased Premises without the prior consent of Owner in each instance. . . . As a condition to any assignment of this Lease by Tenant which is permitted under this Lease, the assignee thereof shall be required to execute and deliver to Owner an agreement, in recordable form, whereby such assignee assumes and agrees with Owner to discharge all obligations of Tenant under this Lease. . . .

"(B) If Tenant shall request Owner's consent to any assignment of this Lease or to any subletting of all or any part of the Leased Premises, Tenant shall submit

to owner with such request the name of the proposed assignee or subtenant, such information concerning its business, financial responsibility and standing as Owner may reasonably require, and the consideration (and the terms and conditions thereof) to be paid for and the effective date of the proposed assignment or subletting."

M West alleged that in January 2006, David Farmer, a representative of Cingular, contacted Homiri Moshiri, the president of M West, and asked if he was still interested in the Cingular space. According to M West, Farmer and Moshiri discussed the terms of an assignment of the lease to M West, which would include a substantial payment by Cingular to M West and Cingular remaining on the lease as a guarantor. M West further alleged that Farmer told Moshiri that in the Cingular lease there was a provision that if Oak Park did not approve of a proposed assignment, then Cingular would be released from the lease. As a result, Farmer told Moshiri that there would be no problem getting Oak Park to approve of the assignment.

M West further alleged that Moshiri contacted an Oak Park representative and requested Oak Park's approval of M West's assumption of the lease. According to M West, Moshiri was assured that M West was approved to proceed and enter into such an assumption. M West asserted that the negotiations with Farmer continued by telephone through April 2006 when Farmer announced that Cingular and M West had a deal. According to M West, Moshiri then contacted Karla Rocker with Oak Park and told her about the agreement that M West and Cingular had reached. M West alleged that Rocker told Moshiri that was fine and M West could proceed with the agreement with Cingular.

On April 5, 2006, Moshiri emailed Jody House, an Oak Park representative, that M West and Cingular had reached a meeting of the minds, subject to Cingular's real estate department's approval, to assign Cingular's lease to M. West. Moshiri stated that he needed to know whether Oak Park's real estate department liked "this idea or not." Houser responded, "I like the idea."

*Communications Between Cingular and M West in April and May 2006*

On April 7, 2006, Farmer, on behalf of Cingular, sent M West a proposed assignment of Cingular's lease at Oak Park. The document read as follows:

"I have been authorized to offer you an assignment of the above referenced property, in exchange for consideration in the amount of $330,000.00 effective June 30, 2006, whose lease has approximately 89 months remaining on the lease. This represents an assignment fee of $180,000.00 plus $150,000.00 (approximately 14 month's rent and charges).

"This is not a binding proposal and is contingent upon Cingular's Real Estate Committee's final approval, consent of the Landlord's mortgagee, if required, and the full execution of a formal binding written assignment agreement mutually acceptable to the parties. However, if this proposal meets with your satisfaction, please sign below and fax it back to me at 831.464.3961 so that I may get final approval from Cingular. Upon approval I will notify you immediately so we may commence producing the necessary documentation.

"I look forward to your fast and favorable reply, since time is of the essence. This proposal shall expire at the close of business on April 14, 2006. Cingular asks that you please respond in writing."

Moshiri "AGREED TO AND ACCEPTED" the proposed assignment by placing his electronic signature on the signature line below those words at the bottom of the document. Thereafter, Moshiri began lining up contractors, cabinet makers, and sign makers that would be ready to remodel Cingular's store space once the proposed assignment was accepted by Oak Park. On May 2, 2006, Moshiri sent an email to Cingular stating that his plan was to have the space remodeled and open by August 1, 2006. Otherwise, because Moshiri would be out of the country during August and September, he stated that the opening of the new store would "end up in October" which "cuts it close" to the holiday shopping season and the store's fall jewelry events.

In an email dated May 8, 2006, Moshiri expressed frustration at Cingular's delay in preparing the proper documents for Oak Park. Moshiri stated: "If this takes much longer, I will have to move on." Cingular responded on May 10, 2006, by attaching a letter that it intended to forward to Oak Park. That same day, a series of emails was sent between Moshiri and Cingular about the terms of the

assignment to be included in the letter to Oak Park. The parties' emails reference the payment of $180,000 by Cingular to M West for assignment of the lease and also a $150,000 payment by Cingular to Oak Park to be credited towards M West's rent and other charges in Cingular's store space.

By letter dated May 11, 2006, Cingular requested Oak Park's consent to the assignment of its lease to M West. Cingular's letter outlined the consideration for the proposed assignment as follows:

"[T]he proposed consideration for the assignment is $150,000.00, which (i) shall be paid directly from Tenant to Owner, for the benefit of Assignee, and (ii) is to be held by Owner in a segregated interest-bearing account for the benefit of Assignee, and from which all future rent and other charges owed by Assignee shall be paid until such amounts are exhausted in full. Tenant shall also make a payment directly to Assignee in the amount of $180,000.00 in connection with this matter."

On May 12, 2006, a Cingular representative sent an email to Moshiri telling him that "[t]he single greatest thing for you in this deal is that Cingular Wireless is the tenant under the lease and will remain primary (financially) under the lease as a de facto guarantor."

On May 17, 2006, Oak Park offered to terminate Cingular's lease in exchange for a $465,000 payment. That same day, Moshiri emailed Oak Park and asked how long it would take to get approval for the proposed assignment of Cingular's lease. Karla Rocker, with Oak Park, responded: "I should have more information for you by the end of the week. We are in the middle of our discussion." On May 23, 2006, Rocker sent a letter to Cingular stating that Oak Park would not consent to the proposed lease assignment.

On June 2, 2006, Cingular sent a letter to Rocker confirming an agreement between Oak Park and Cingular for Oak Park to terminate Cingular's lease on June 15, 2006, in exchange for a $400,000 payment.

In November 2006, M West sued Oak Park and Cingular. M West claimed that Cingular breached its assignment agreement with M West. In addition, M West made claims of breach of contract and tortious interference with a prospective business advantage or relationship against Oak Park.

In December 2007, Cingular moved for summary judgment against M West. Cingular argued that M West could not satisfy the statute of frauds for its breach of contract claim. The trial court determined that the communications between Cingular and M West showed only continuing negotiations and that a meeting of the minds as to the terms of a mutually acceptable lease assignment between Cingular and M West could not be established. The trial court found that because the writings between the parties did not evidence an existing and binding contract, the statute of frauds had not been satisfied. Accordingly, the trial court granted summary judgment to Cingular on M West's breach of contract claim.

In July 2008, Oak Park moved for summary judgment against M West. Oak Park argued that there existed no genuine issues of material fact as to whether an enforceable contract existed between the parties, thereby precluding M West's breach of contract and tortious interference claims against it. On M West's breach of contract claim, the trial court determined that the undisputed facts did not support an inference that Oak Park and M West had entered into an agreement. On M West's tortious interference claim, the trial court determined that Oak Park "had a contractual right to engage in the conduct complained of, and the available evidence, even when resolved in favor of the nonmoving party, is not strong enough to raise a non-speculative inference" that Oak Park "was not justified in acting to terminate its lease for consideration that Cingular agreed to pay." Accordingly, the trial court granted summary judgment to Oak Park on M West's breach of contract and tortious interference claims.

## SUMMARY JUDGMENT

### *Standard of Review*

When the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law, summary judgment is appropriate. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When oppos-

ing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, the same rules apply; summary judgment must be denied if reasonable minds could differ as to the conclusions drawn from the evidence. *Miller v. Westport Ins. Corp.*, 288 Kan. 27, 32, 200 P.3d 419 (2009).

## M West's Breach of Contract Claim Against Cingular

*Statute of Frauds*

The trial court's primary basis for granting summary judgment to Cingular was that the statute of frauds had not been satisfied in this case. M West argues, however, that the emails and letter exchanged by M West and Cingular constitute memoranda of an agreement that satisfy the statute of frauds.

Neither party disputes that the agreement between Cingular and M West must satisfy the statute of frauds in order to be a valid contract. Indeed, the statute of frauds applies to all contracts for the assignment of an interest in property for a term of more than 1 year. See K.S.A. 33-105 (providing that "[n]o leases, estates or interests of, in or out of lands, exceeding one year in duration, shall at any time hereafter be assigned or granted, unless it be by deed or note, in writing, signed by the party so assigning or granting the same").

Quoting *Walton v. Piqua State Bank*, 204 Kan. 741, 747, 466 P.2d 316 (1970), this court in *Kenby Oil Co. v. Lange*, 30 Kan. App. 2d 439, 442, 42 P.3d 201 (2002), outlined the requirements to satisfy the statute of frauds as follows:

" ' "A Memorandum, in order to be enforceable under the statute of frauds, may be any document or writing, formal or informal, signed by the party to be charged or by his lawfully authorized agent, which states with reasonable certainty (a) each party to the contract either by his own name, or by such a description as will serve to identify him, or by the name or description of his agent, (b) the land or other subject matter to which the contract relates, and (c) the terms and conditions of all the promises constituting the contract and by whom and to whom the promises are made." ' [Citation omitted.]"

See Restatement (Second) of Contracts § 131 (1979).

Our Supreme Court has recently held that the statute of frauds requires that only the material terms of a contract are to be stated with reasonable certainty; see *Botkin v. Security State Bank*, 281 Kan. 243, 250, 130 P.3d 92 (2006); see also *Federal Deposit Ins. Corp. v. Neitzel*, 769 F. Supp. 346, 349 (D. Kan. 1991) (citing *Barnhart v. McKinney*, 235 Kan. 511, 524, 682 P.2d 112 [1984]) (material terms need only be stated with reasonable certainty). Furthermore, for the purpose of satisfying the statute of frauds, separate writings may be construed together in order to determine whether there is sufficient written agreement upon which to base an enforceable contract. *Young v. Hefton*, 38 Kan. App. 2d 846, 856, 173 P.3d 671 (2007).

Here, the April 2006 proposed assignment agreement and the communications between the parties in April and May 2006 met all the requirements to satisfy the statute of frauds. The proposed assignment agreement, the emails from Cingular, and the May 2006 letter to Oak Park requesting assignment of Cingular's lease were all signed by a representative for Cingular, the party to be charged. Moreover, the April and May 2006 communications identify the parties to the proposed assignment and the subject matter to which the contract relates. Specifically, the proposed assignment was for M West to assume Cingular's lease for its store space.

Finally, the material terms of the proposed assignment were stated with reasonable certainty within the April and May 2006 communications. Based on the proposed assignment agreement and the later communications between the parties, M West was to take over Cingular's lease agreement with Oak Park. The proposed assignment agreement between M West and Cingular went so far as to set forth the effective date of June 30, 2006. In consideration for the assignment, Cingular would pay M West an assignment fee of $180,000 plus $150,000 to be used towards rent and charges for Cingular's store space. Indeed, the May 11, 2006, letter from Cingular to Oak Park requesting Oak Park's consent to the assignment set forth the proposed assignment of Cingular's lease to M West and the agreed amount of the consideration to be paid by Cingular to M West. Further, Cingular made clear in its communications to

M West that Cingular would remain a guarantor on the assigned lease.

Because the communications between the parties in April and May 2006 were sufficiently specific to satisfy the applicable requirements of the statute of frauds, the trial court erred in determining that the statute of frauds had not been met.

*Existence of Binding Contract*

In determining that Cingular and M West did not have an existing binding contract, the trial court also found that the letters and emails between M West and Cingular indicated that the parties were involved only in negotiations for an assignment of Cingular's lease agreement. The trial court determined that the conditions of (1) a formal binding written assignment agreement and (2) approval of the assignment by Oak Park were conditions that had to be met before a contract could be formed between the parties.

M West contends, however, that it and Cingular had formed a binding contract and that Oak Park's approval and execution of a formal assignment agreement was a condition precedent to *performance* of the contract.

Not surprisingly, Cingular agrees with the trial court's determination and argues that the unsatisfied conditions precedent preclude M West's breach of contract action against it. Cingular asserts that the conditions of Oak Park's consent to the assignment and the execution of a mutually acceptable written agreement were conditions precedent to the *formation* of a contract between it and M West.

When the evidence pertaining to the existence of a contract or the content of the contract's terms is conflicting or permits more than one inference, a question of fact is presented. Nevertheless, whether undisputed facts establish the existence and terms of a contract raise a question of law for the court's determination. *Nungesser v. Bryant*, 283 Kan. 550, 566, 153 P.3d 1277 (2007).

Our Supreme Court in *Wallerius v. Hare*, 194 Kan. 408, 412, 399 P.2d 543 (1965), defined a "condition precedent" as follows:

"A condition precedent is something that it is agreed must happen or be performed before a right can accrue to enforce the main contract. It is one without

the performance of which the contract, although in form executed and delivered by the parties, cannot be enforced. A condition precedent requires the performance of some act or the happening of some event after the terms of the contract, including the condition precedent, have been agreed on before the contract shall take effect. [Citation omitted.]"

Thus, a condition precedent is simply "something that is agreed must happen or be performed before a right can occur to enforce the main contract." *Weinzirl v. The Wells Group, Inc.*, 234 Kan. 1016, Syl. ¶ 3, 677 P.2d 1004 (1984). Under our Supreme Court's definition, the presence of a condition precedent does not stymie the formation of a contract, but rather becomes part of the contract itself. "When all terms of a contract have been agreed upon and a condition precedent to requiring performance is accepted, the condition precedent becomes part of the main contract and the agreement is consummated." *Wallerius v. Hare*, 200 Kan. 578, Syl. ¶ 1, 438 P.2d 65 (1968).

Courts have recognized two types of conditions precedent: conditions precedent to *performance under an existing contract* and conditions precedent to the *formation of a contract*. "In the law of contracts, conditions may relate to the existence of contracts or to the duty of immediate performance under them. Thus, there may be conditions to the formation of a contract, or conditions to performance of a contract." 13 Williston on Contracts, § 38:4, p. 375 (4th ed. 2000). Conditions precedent to performance under an existing contract arise from the terms of a valid contract and define an event that must occur before a right or obligation matures under the contract. In contrast, conditions precedent to the formation of a contract involve issues of offer and acceptance which precede and determine the formation of a contract. *City of Haverhill v. George Brox, Inc.; Gordon Construction Corporation*, 47 Mass. App. Ct. 717, 719-20, 716 N.E.2d 138 (1999) (citing Corbin on Contracts § 628 [1960 & Supp. 1999]; 5 Williston on Contracts § 666A [3d ed. 1961 & Supp. 1999]; Restatement [Second] of Contracts § 224 [1979]).

Substantial authority exists, however, that most conditions precedent are conditions precedent to *performance* under an existing contract rather than conditions precedent to *formation* of a con-

tract. See *Oppenheimer & Co. v. Oppenheim*, 86 N.Y.2d 685, 690, 636 N.Y.S.2d 734, 660 N.E.2d 415 (1995) (citing Calamari & Perillo, Contracts § 11-5, p. 440 [3d ed. 1987]) ("Most conditions precedent describe acts or events which must occur before a party is obliged to perform a promise made pursuant to an existing contract, a situation to be distinguished conceptually from a condition precedent to the formation or existence of the contract itself."); 13 Williston on Contracts, § 38:4, p. 381 (4th ed. 2000) ("The fact that no duty of performance on either side can arise until the happening of the condition does not . . . make the validity of the contract depend upon its happening."); see also *Wood v. Cunningham*, 140 N.M. 699, 702, 147 P.3d 1132 (2006) ("Generally, a condition precedent is an event occurring after the formation of a valid contract, an event that must occur before there is a right to an immediate performance."); 13 Williston on Contracts § 38:7, p. 394 ("A condition precedent in a contract is the typical kind. It must be performed or happen before a duty of immediate performance arises on the promise which the condition qualifies.").

Whether conditions are considered prerequisites to formation of a contract or prerequisites to an obligation to perform under an existing agreement is controlled by the intent of the parties. *Western Commerce Bank v. Gillespie*, 108 N.M. 535, 537, 775 P.2d 737 (1989); *Hohenberg Bros. Co. v. George E. Gibbons & Co.*, 537 S.W.2d 1, 3 (Tex. 1976).

The issue here is whether the parties intended to form a binding contract with conditions precedent to the *performance* under the contract or whether they intended their communications to result in the *formation* of a contract only after the conditions precedent were met. In analyzing this issue, we bear in mind that " '[a] court should be cautious in granting a motion for summary judgment when resolution of the dispositive issue necessitates a determination of the state of mind of one or both of the parties.' [Citation omitted.]" *Brennan v. Kunzle*, 37 Kan. App. 2d 365, 378, 154 P.3d 1094, *rev. denied* 284 Kan. 945 (2007). If a genuine material issue of fact exists as to whether the April 2006 proposed assignment agreement, along with the parties' communications in April and May 2006, evidenced the intent of the parties to create an existing

binding contract, the performance of which would be required when the conditions precedent were satisfied, then summary judgment was improper on this issue.

In looking at the April 2006 assignment agreement and the April and May 2006 communications between the parties, we note that all the components of a valid contract are present: offer, acceptance, consideration, and the terms setting forth the rights and obligations of the parties. The terms were mutually agreed upon by M West and Cingular. The conditions of Oak Park's approval of the proposed assignment and execution of a formal assignment agreement were the same conditions contained in the lease agreement between Cingular and Oak Park. Cingular and Oak Park's lease agreement required that these two conditions must be satisfied before Oak Park would approve Cingular's assignment of the lease to another party.

Consequently, if we were to accept Cingular's argument that the two previously mentioned conditions had to be satisfied before a contract came into existence between M West and Cingular, there would be absolutely nothing left for either party to perform once those conditions precedent were satisfied. In other words, when those conditions precedent were satisfied, the contract between M West and Cingular would form. Nevertheless, no performance would be required of either party because the assignment of Cingular's lease to M West would already have been completed.

Although Cingular successfully argued to the trial court that the communications between the parties showed that they were involved in preliminary negotiations and that the parties were not yet to the contract stage, there is contract language throughout the April 2006 proposed assignment agreement indicating that the parties intended to form a binding contract.

Specifically, the Cingular representative opened the April proposed assignment agreement with an offer, recitation of consideration, and the effective date of the agreement: "I have been authorized *to offer* you an assignment of the above referenced property, *in exchange for consideration* in the amount of $330,000 *effective June 30, 2006*, whose lease has approximately 89 months remaining on the lease." (Emphasis added.) The Cingular repre-

sentative then broke down the $330,000 consideration as follows: "This represents an assignment fee of $180,000.00 plus $150,000.00 (approximately 14 month's rent and charges)."

Then, at the close of the proposed assignment, Cingular's representative stated that "time is of the essence," which is a term peculiar to a contractual requirement, and set an expiration date for the "proposal": "I look forward to your fast and favorable reply, since *time is of the essence. This proposal shall expire at the close of business on April 14, 2006.* Cingular asks that you please respond in writing." (Emphasis added.) Finally, the Cingular representative included a signature line for Moshiri at the bottom of the document immediately preceded by the words "AGREED TO AND ACCEPTED BY."

The material terms of the proposed assignment were later referenced in emails between the parties and further details were hammered out about how the proposed consideration was to be kept in an interest-bearing account. The terms of the proposed assignment, along with the additional details, were included in the letter that Cingular ultimately sent to Oak Park requesting assignment of its lease to M West.

By setting forth the particular terms of the agreement, including consideration and the effective date of the assignment, and requiring M West to accept its offer, it seems that Cingular may have intended to create a binding agreement. Further, the communications between the parties in April and May 2006 and the letter that Cingular ultimately sent to Oak Park requesting approval of assignment of its lease to M West appears to indicate that the parties had reached an agreement on the material terms of the assignment and intended to be bound by those terms.

Moreover, although Cingular maintains that there was never the "full execution of a formal binding written assignment agreement" in this case as referenced in the proposed assignment agreement, a jury could infer that the proposed assignment was actually a contract to make a contract if Oak Park consented to the terms of the assignment. 1 Perrilo, Corbin on Contracts § 2.8, pp. 133-34 (1993) offers the following insight on agreements binding parties to make another agreement:

"It is quite possible for parties to make an enforceable contract binding them to prepare and execute a subsequent final agreement. In order that such may be the effect, it is necessary that agreement shall have been expressed on all essential terms that are to be incorporated in the document. That document is understood to be a mere memorial of the agreement already reached. If the document or contract that the parties agree to make is to contain any material term that is not already agreed on, no contract has yet been made; the so-called 'contract to make a contract' is not a contract at all."

Here, the material terms of the assignment had been agreed upon when Cingular presented the proposed assignment to Oak Park. If Oak Park gave its consent to the assignment, Cingular and M West would have only had to memorialize the essential terms of the agreement that had already been reached. As a result, the jury could infer that the parties had intended to be bound by the proposed assignment.

On the other hand, Cingular included the following language in the proposed assignment indicating that it did not intend to create a binding contract at that time with M West: "This is not a binding proposal and is contingent upon Cingular's Real Estate Committee's final approval, consent of the Landlord's mortgagee, if required, and the full execution of a formal binding written assignment agreement mutually acceptable to the parties." This was the language relied upon heavily by the trial court in granting Cingular's motion for summary judgment.

Although the above-referenced language seems to indicate that Cingular did not intend to create a binding agreement, there are also facts that would compel a contrary conclusion. These are questions of fact for a jury, not for summary judgment. As discussed previously, the contract language within the proposed assignment, the fact that Cingular required M West's acceptance to the terms in writing, the parties' later communications, and the letter sent by Cingular to Oak Park requesting approval of the proposed assignment all appear to indicate that the parties did intend to create a binding agreement.

As explained in Corbin on Contracts § 2.9, p. 144, when parties have considered and settled the details of a proposed agreement, there is often a difficult question of fact whether the parties have

the understanding that neither party is to be bound until they execute a formal written document:

"One of the most common illustrations of preliminary negotiation that is totally inoperative is one where the parties consider the details of a proposed agreement, perhaps settling them one by one, with the understanding during this process that the agreement is to be embodied in a formal written document and that neither party is to be bound until they execute this document. At times they execute a letter of intent, with the understanding that they are not bound until a later definitive writing is drafted, approved and executed. Often it is a difficult question of fact whether the parties have this understanding. There are very many decisions holding both ways. These decisions should not necessarily be regarded as conflicting, even though it may be hard to reconcile some of them on the facts that are reported to us in the appellate reports. *It is a question of fact that the courts are deciding, not a question of law; and the facts of each case are numerous and not identical with those of any other case. In very many cases the question may properly be left to a jury.*" (Emphasis added.)

As our Supreme Court stated in *Sidwell Oil & Gas Co. v. Loyd*, 230 Kan. 77, 83, 630 P.2d 1107 (1981), "[w]hen the evidence pertaining to the existence of a contract is conflicting a question is presented for the trier of facts. The controlling question as to whether a binding contract was entered into depends on the intention of the parties and is a question of fact."

We cannot say as a matter of law whether the parties intended Oak Park's consent to the lease assignment and the parties' signature to a formal assignment agreement to be conditions precedent to the formation of a contract, as urged by Cingular, or merely conditions precedent to future events that the parties agreed should be fulfilled by the cooperative conduct of each party within a reasonable time. As a result, we determine that material fact issues exist as to the parties' intent to be bound by the correspondence between them.

## Implied Duty of Good Faith and Fair Dealing

M West also contends that a factual issue was presented as to whether Cingular acted in good faith with respect to the conditions precedent of gaining Oak Park's approval of the proposed assignment and executing a formal written assignment agreement. Importantly, the success of M West's good faith argument is depend-

ent upon a jury's finding on the previous issue, that is, whether the parties intended to form a binding contract.

Kansas recognizes the duty of good faith and fair dealing in every contract, with the exception of employment-at-will contracts. *Estate of Draper v. Bank of America*, 288 Kan. 510, 525, 205 P.3d 698 (2009); see Restatement (Second) of Contracts § 205 (1979). Generally, good faith and reasonableness in contract matters are factual questions. Summary judgment is appropriate on those matters, however, when the facts are uncontroverted and establish that a defined standard has been met. *Estate of Draper*, 288 Kan. at 528.

The duty of good faith and fair dealing that is usually imposed on every contract requires at least that a party do nothing to prevent the occurrence of a condition of that party's duty. A party, however, may be required to do more than refrain from action that will prevent the occurrence of the condition. Often, a party is expected to take affirmative steps to see that the condition occurs. Farnsworth, Contracts § 8.6 (3d ed. 1999), pp. 544-45.

Courts in other jurisdictions have held that when a contract contains a condition precedent to a party's performance obligation and the occurrence of the condition is within the control of that party, the party must make a good-faith effort to bring about the condition. *Johnson v. Lambros*, 143 Idaho 468, 474, 147 P.3d 100 (2006); see *Aquasource v. Wind Dance Farm, Inc.*, 833 N.E.2d 535, 539 (Ind. App. 2005) ("[A] party may not rely on the failure of a condition precedent to excuse performance where that party's own action or inaction caused the failure. When a party retains control over when the condition will be fulfilled, it has an implied obligation to make a reasonable and good faith effort to satisfy the condition."); *Brown v. Alron, Inc.*, 223 Neb. 1, 4, 388 N.W.2d 67 (1986); *Tacoma Northpark, L.L.C. v. NW, L.L.C.*, 123 Wash. App. 73, 82, 96 P.3d 454 (2004).

It is a principle in the law of contracts that a bilateral contract contains an implied condition on both parties to cooperate with each other in obtaining the goals of the contract. See *Vanadium Corporation v. Fidelity & Deposit Co.*, 159 F.2d 105, 108 (2d Cir. 1947) (" '[W]herever the cooperation of the promisee is necessary

for the performance of the promise, there is a condition implied in fact that the cooperation will be given.'"). Moreover, not only is there an implied condition for the parties to cooperate in such performance if cooperation is necessary in achieving the goals of the bilateral contract, but also there is an implied condition to not prevent performance or make it impossible for the other party to perform, which we will discuss next.

Nevertheless, the question of whether Cingular lived up to the basic requirement of cooperation to secure the assignment of the lease and whether Cingular negotiated in good faith when seeking Oak Park's approval of the assignment must wait until a jury determines if a contract was formed between M West and Cingular.

### Doctrine of Prevention

The prevention doctrine is substantially related to the implied covenant of good faith and fair dealing that is implicit in every contract. See *Cauff, Lippman & Co. v. Apogee Finance Group, Inc.*, 807 F. Supp. 1007, 1022 (S.D.N.Y. 1992). 13 Williston on Contracts § 39:6, pp. 530-31, explains that the prevention doctrine is based on the duty of good faith as follows:

"[T]he principle of prevention is based on the implied agreement of the parties to a contract to proceed in good faith and cooperate in performing the contract in accordance with its expressed intent and, therefore, to refrain from committing any willful act or omission that would interfere with the other party or prevent or make it impossible for the other party to perform."

Our Supreme Court in *Wallerius*, 194 Kan. at 412, has explained the prevention doctrine as follows:

"While the condition precedent must have happened before the contract can be enforced or relief sought in the way of specific performance, the party who has demanded the condition precedent cannot hinder, delay or prevent its happening for the purpose of avoiding performance of the contract. We believe the rule announced in *Talbott v. Nibert*, 167 Kan. 138, 206 P.2d 131, is applicable here. On page 146 of the opinion it is stated:

" 'The rule is clear and well settled, and founded in absolute justice, that a party to a contract cannot prevent performance by another and derive any benefit, or escape any liability, from his own failure to perform a necessary condition. [Citations omitted.] And this is the universal rule. 12 Am. Jur., Contracts, §§ 381, 386; 2 C.J., Agency, § 439, p. 772; 13 C.J., Contracts, §§ 721, 722, 723; Restatement, Contracts, § 315.' "

13 Williston on Contracts § 39:4, pp. 523-25, further explains the doctrine of prevention as follows:

"If a promisor prevents or hinders the occurrence or fulfillment of a condition to his or her duty of performance, the condition is excused; in other words, 'the nonoccurrence or nonperformance of a condition is excused where the failure of the condition is caused by the party against whom the condition operates to impose a duty.' Accordingly, the liability of the promisor is fixed regardless of the failure to fulfill the condition. The pertinent rule set forth in the Restatement (Second) of Contracts [§ 245 (19790], is that where a party's breach by nonperformance contributes materially to the nonoccurrence of a condition of one of his duties, the nonoccurrence is excused, so that performance of the duty that was originally subject to its occurrence can become due in spite of its nonoccurrence.

"The prevention doctrine thus operates as an exception to the general rule that one has no duty to perform under a contract containing a condition precedent until the condition occurs. In effect, where one improperly prevents the performance or the happening of a condition of his or her own promissory duty, the offending party thereby eliminates it as a condition, or, viewed another way, the condition is considered as waived or fulfilled. The promisor who prevents the fulfillment of a condition precedent or its performance by the other party to contract cannot rely on the nonoccurrence of such condition to defeat his or her liability."

In this case, the evidence showed that despite its pending proposed assignment with M West, Cingular engaged in negotiations with Oak Park to terminate its lease agreement for a lump sum payment. This undoubtedly resulted in a better deal for Cingular. Based on the limited evidence currently before this court, a factual issue is presented as to whether Cingular hindered or prevented the occurrence of the condition precedent of Oak Park's approval of the proposed assignment.

Because these issues of fact require resolution by a jury, we determine that the trial court improperly granted Cingular's motion for summary judgment based upon Cingular's contention that the parties had not formed a binding contract.

*M West's Tortious Interference Claim Against Oak Park*

Importantly, as to its claims against Oak Park, M West argues only that the trial court should not have granted summary judgment on its tortious interference with a prospective business advantage or relationship claim. Because M West makes no argument

on its breach of contract claim against Oak Park, M West has waived any issue concerning the trial court's grant of summary judgment in favor of Oak Park on the breach of contract claim. See *Kingsley v. Kansas Dept. of Revenue*, 288 Kan. 390, 395, 204 P.3d 562 (2009) (An issue not briefed by a party is deemed waived or abandoned.).

M West maintains that based upon the summary judgment standard of review, the trial court erroneously determined that M West's tortious interference claim was not viable because there was no malice or lack of justification by Oak Park.

Tortious interference with a prospective business advantage or relationship seeks to protect future or potential contractual relations and is predicated on malicious conduct by a defendant. *Turner v. Halliburton Co.*, 240 Kan. 1, 12, 722 P.2d 1106 (1986). The elements of tortious interference with a prospective business relationship are:

"(1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff; (2) knowledge of the relationship or expectancy by the defendant; (3) that, except for the conduct of the defendant, plaintiff was reasonably certain to have continued the relationship or realized the expectancy; (4) intentional misconduct by defendant; and (5) damages suffered by plaintiff as a direct or proximate cause of defendant's misconduct." *Turner*, 240 Kan. at 12.

Our Supreme Court has held that a party may be privileged or justified to interfere with contractual relations in certain situations. *Burcham v. Unison Bancorp, Inc.*, 276 Kan. 393, 425, 77 P.3d 130 (2003). "The issues of defendants' motive and the presence or absence of malice are typically questions for the jury. [Citation omitted.]" 276 Kan. at 425.

" ' "The term 'justification' has been said not to be susceptible of any precise definition. It is employed to denote the presence of exceptional circumstances which show that no tort has been in fact committed and to connote lawful excuse which excludes actual or legal malice." ' [Citations omitted.]" 276 Kan. at 425. Our Supreme Court in *Turner* also stated that " '[g]enerally, a circumstance is effective as a justification if the defendant acts in the exercise of a right equal or superior to that of the plaintiff, or in the pursuit of

some lawful interest or purpose, but only if the right is as broad as the act and covers not only the motive and purpose but also the means used.' " 240 Kan. at 13 (quoting 45 Am. Jur. 2d, Interference § 27, p. 305); see PIK Civ. 4th 124.93 ("Justification exists when the defendant interfered in the exercise of a right equal to or superior to that of the plaintiff and used fair means and good faith for some lawful interest or purpose.").

Our Supreme Court in *Turner*, 240 Kan. at 14, noted that the Restatement (Second) of Torts § 767 (1977) does not speak in terms of privilege or justification; rather, the Restatement refers to tortious conduct as "improper." Our Supreme Court noted that § 767 sets forth the following seven factors to be considered in determining whether a defendant's conduct is improper:

"(a) the nature of the actor's conduct,

"(b) the actor's motive,

"(c) the interests of the other with which the actor's conduct interferes,

"(d) the interests sought to be advanced by the actor,

"(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

"(f) the proximity or remoteness of the actor's conduct to the interference, and

"(g) the relations between the parties." 240 Kan. at 14.

See also PIK Civ. 4th 124.93 (In determining whether justification exists for a tortious interference, the above seven factors should be considered.).

Despite the previously mentioned rule that the issues of a defendant's motive and the presence of absence or malice are typically a question for the jury, the trial court in this case determined the issues as a matter of law. In rejecting M West's argument that there was a genuine issue of material fact as to whether Oak Park acted maliciously and without justification, the trial court focused on Oak Park's contractual right under Cingular's lease to not approve a proposed assignment. Specifically, the trial court stated:

"M West claims it was misled to believe a proposed assignment agreement would be approved when, in fact, Oak Park Mall never intended to consent to an assignment. M West offers no direct evidence that Oak Park never intended to consent other than the result that Oak Park and Cingular terminated the lease. Under the terms of the lease agreement, however, Oak Park Mall had a contractual right to terminate the lease agreement with Cingular. *See* Lease Agreement

§ 16.01(B). M West's suggestion that Oak Park Mall was waiting for a proposed assignment agreement so that it could offer a better deal to Cingular carries very little weight. Under the terms of the lease agreement, Oak Park Mall always would have an opportunity to do this because Cingular was required to submit information about a potential assignment to Oak Park Mall for approval. The mall also always would have the opportunity to either terminate the lease or modify the tenant's lease agreement. As such, emails and telephone conversations where Oak Park Mall representatives stated that an assignment would be 'fine' are not enough to show that the mall lacked good faith or used unfair means under these circumstances.

"M West offers no evidence as to the negotiations or discussions between Oak Park Mall and M West to suggest any improper motive other than two contractual parties reaching an agreement to end a lease. *Oak Park Mall had a contractual right to engage in the conduct complained of, and the available evidence, even when resolved in favor of the nonmoving party, is not strong enough to raise a non-speculative inference that Oak Park Mall was not justified in acting to terminate its lease for consideration that Cingular agreed to pay.*" (Emphasis added.)

Thus, the trial court essentially determined that the undisputed evidence showed that Oak Park was justified in its actions and that it did not act improperly in negotiating for termination of Cingular's lease.

The trial court's rationale, however, glosses over the fact that there was evidence presented by M West indicating that Oak Park had induced M West, over several months, to proceed with an assignment agreement with Cingular and then had used that agreement as a bargaining chip to terminate Cingular's lease for a substantial cash payment. Moreover, the evidence establishes that despite Oak Park's actions in engaging Cingular in negotiations to terminate its lease, Oak Park failed to disclose this fact to M West and even went so far as to indicate to M West that it was still considering the proposed assignment.

If we were to assume that M West and Cingular had a binding contract, the evidence brought forth at the summary judgment stage showed the following: (1) Oak Park knew of the existence of that business relationship; moreover, it was aware of the probability of the future economic benefit to M West; (2) Oak Park had knowledge of the relationship or expectancy by M West (Oak Park was aware of what monies M West would receive if Oak Park approved the assignment of the lease); (3) M West was reasonably certain to

have continued the relationship, except for the conduct of Oak Park (M West and Cingular would have mutually cooperated with each other in satisfying the conditions precedent, which would have allowed Cingular to assign its lease to M West) or realized the expectancy (M West would be allowed to complete the remaining term of Cingular's lease); (4) Oak Park engaged in intentional misconduct (Oak Park induced Cingular not to perform its contract with M West by entering into negotiations with Cingular to terminate Cingular's lease—preventing M West from realizing its expectancy that it would be allowed to assume Cingular's lease); and (5) damages were suffered by M West as a direct consequence or proximate result of Oak Park's conduct (M West would have received $180,000 directly; $150,000 indirectly [future lease payments]; plus, a prime location to sell its jewelry).

Based on the nature of the relationship between M West and Cingular, the viability of M West's tortious interference claim is dependent on whether a binding contract is found to exist between M West and Cingular. Although the tort of tortious interference with a prospective business advantage or relationship does not require the existence of a binding contract and can be based upon future contractual relations, it is apparent that M West's tortious interference claim against Oak Park would require a binding contract between M West and Cingular. If there was no binding contract between M West and Cingular, then M West could not have been reasonably certain to have continued the existing business relationship or to have realized the expectancy of assuming Cingular's lease. On the other hand, if an existing binding contract did exist between M West and Cingular, the limited evidence in the appellate record is sufficient to establish a genuine issue of material fact as to whether Oak Park engaged in intentional misconduct which was unjustified and malicious.

Nevertheless, Oak Park asserts that no genuine issue of material fact could exist as to M West's tortious interference claim against it because under Cingular's lease, Oak Park did not have to accept an assignment of Cingular's lease and could simply terminate the lease. Specifically, the applicable portion of Section 16.01(B) of Cingular's lease agreement provides as follows:

"(B) If [Cingular] shall request [Oak Park]'s consent to any assignment of this Lease or to any subletting of all or any part of the Leased Premises, [Cingular] shall submit to [Oak Park] with such request the name of the proposed assignee or subtenant, such information concerning its business, financial responsibility and standing as [Oak Park] may reasonably require, and the consideration (and terms and conditions thereof) to be paid for and the effective date of the proposed assignment or subletting. Upon receipt of such request and all such information, [Oak Park] shall have the right (without limiting [Oak Park]'s right of consent in respect of such assignment or subletting), by giving notice to [Cingular] within 15 days thereafter, (i) to terminate this Lease if the request is for an assignment or a subletting of all the Leased Premises, or (ii) if such request is to sublet a portion of the Leased Premises only, to terminate this Lease with respect to such portion. If [Oak Park] exercises its right to terminate this Lease, the effective date of termination shall be set forth in [Oak Park]'s notice to [Cingular] . . . ."

Thus, Oak Park points out that under Cingular's lease it could make a business decision to terminate Cingular's lease instead of accepting the proposed assignment to M West.

Oak Park's argument, however, misses the point. While Oak Park did have the option under its lease agreement with Cingular to not accept the assignment of Cingular's lease to M West and to terminate Cingular's lease, Oak Park could still be found to have tortiously interfered with M West's business advantage or relationship if Oak Park failed to use fair means and good faith in the exercise of that right. See PIK Civ. 4th 124.93 ("Justification exists when the defendant interfered in the exercise of a right equal to or superior to that of the plaintiff and used fair means and good faith for some lawful interest or purpose.") In other words, Oak Park's right to terminate Cingular's lease would not justify any and all means used by Oak Park in exercising that termination right. See *Turner*, 240 Kan. at 13 (" 'Generally, a circumstance is effective as a justification if the defendant acts in the exercise of a right equal or superior to that of the plaintiff, or in the pursuit of some lawful interest or purpose, *but only if the right is as broad as the act and covers not only the motive and purpose but also the means used.'* " [Emphasis added.]).

Here, before exercising its option not to accept the assignment of Cingular's lease to M West, Oak Park induced M West to continue its performance under the contract with Cingular in the ex-

pectation of consummating its contractual obligation with Cingular to assume Cingular's lease. Nevertheless, unbeknownst to M West, Oak Park began negotiations with Cingular to terminate Cingular's lease. Moreover, Oak Park induced Cingular to renege on its promise to M West to cooperate with each other (Cingular and M West) in satisfying the conditions precedent to the assignment of Cingular's lease to M West. Thus, Oak Park invaded the contractual promises between M West and Cingular to the detriment of M West's business advantage or relationship between M West and Cingular.

Although the dissent cites cases where summary judgment was properly granted in favor of the lessor or mortgage holder on an interference-with-contractual relations claim, the facts in those cases are far different from the facts in the present case. For example, unlike the cases cited by the dissent, C (Oak Park) induced A (M West) to form its contract with B (Cingular) while inducing B (Cingular) not to perform its contract with A (M West). Moreover, the record indicates that C (Oak Park) was inducing B (Cingular) not to perform its contract with A (M West) before C (Oak Park) exercised its option to reject the assignment of B's (Cingular's) lease to A (M West). As a result, the cases cited by the dissent are simply not analogous to the present case.

Indeed, under the circumstances present in this case, a jury could conclude that Oak Park's conduct in inducing M West to proceed with an assignment agreement with Cingular and in leading M West to rely on its representations that it liked the idea of M West occupying Cingular's store space and that it was seriously considering the assignment agreement, when in actuality Oak Park was negotiating with Cingular to terminate Cingular's lease entirely, knowing that this would prevent M West from ever achieving its expectancy that it would be allowed to assume Cingular's lease, did not use fair means and good faith in exercising its right to terminate Cingular's lease.

Based on the previous reasoning, we reverse the trial court's judgment granting summary judgment to Cingular and Oak Park and remand for further proceedings consistent with this opinion.

Reversed and remanded.

\* \* \*

LEBEN, J., concurring in part and dissenting in part: I agree with the majority that summary judgment cannot be granted to Cingular Wireless, but I cannot agree that M West has provided sufficient evidence to avoid summary judgment in favor of Oak Park Mall.

Cingular's written offer on April 7, 2006, purported to have three conditions precedent to the formation of a contract, and two of the three were under Cingular's control: approval by Cingular's "Real Estate Committee" and the execution of a formal document agreeable to both parties. On the evidence presented by M West, the third condition—the consent of Oak Park Mall, Cingular's landlord—also may have been effectively controlled or influenced by Cingular. The majority correctly notes that Cingular's offer, which M West accepted, contained lots of language that appeared to make it a binding contract offer and that it contained all of the material terms for the lease assignment. Thus, Cingular had a duty of good faith and fair dealing to M West not to rely upon conditions under Cingular's control to prevent formation of the contract. M West has presented sufficient evidence that this duty may have been violated through Cingular's later interactions with Oak Park Mall.

But that does not make Oak Park Mall liable for tortious interference with the potential business advantage M West might have gained from taking over Cingular's lease. To avoid summary judgment, M West must have some evidence to support a reasonable inference that Oak Park Mall acted with malice—sometimes phrased as acting without privilege or justification—when denying approval of the assignment. See *Turner v. Halliburton Co.*, 240 Kan. 1, 12-13, 722 P.2d 1106 (1986); *Linden Place v. Stanley Bank*, 38 Kan. App. 2d 504, Syl. ¶ 7, 167 P.3d 374 (2007); *Mediware Information Systems, Inc. v. McKesson Information Solutions*, 2007 WL 926142, at *4 (D. Kan. 2007) (unpublished opinion).

M West recognized in its motion to reconsider in the district court that its cause of action for tortious interference was "predicated on malicious conduct by the defendant." See *Burcham v.*

*Unison Bancorp, Inc.*, 276 Kan. 393, 425, 77 P.3d 130 (2003). M West also recognized that Oak Park Mall eventually negotiated a deal for itself with Cingular that was to Oak Park Mall's financial advantage. M West then argued that this supported an inference of malicious conduct in that "Oak Park was interested in M West and Cingular submitting a proposal so that Oak Park could then negotiate a better deal for itself." But merely acting in one's own financial interest does not establish malicious conduct, which is conduct done with an intent to harm another party without reasonable justification. See *Linden Place*, 38 Kan. App. 2d at 513.

Thus, other courts have properly granted summary judgment when—as is the case here—there was no specific evidence of malicious intent and a mortgage holder or a lessor has exercised its contractual right to deny approval to a lease or lease assignment. *E.g., RAN Corp. v. Hudesman*, 823 P.2d 646 (Alaska 1991) (summary judgment properly granted against interference-with-contractual-relations claim when lessor exercised his contractual right to deny approval of lease assignment and plaintiff had no evidence that lessor did so for spiteful motives); *Schulman v. J.P. Morgan Inv. Management, Inc.*, 35 F.3d 799 (3d Cir. 1994) (summary judgment granted against interference-with-contractual-relations claim when lender/mortgage holder exercised its contractual right to disapprove prospective building tenant). In more general circumstances, courts have granted summary judgment against interference-with-contractual-relations claims when the defendant presented evidence that it acted out of legitimate business interests and there was a lack of evidence of malice or general bad motive. *E.g., Linden Place*, 38 Kan. App. 2d at 513-14; *Scudder v. International Air Service Co., Ltd.*, 1998 WL 560070 (9th Cir. 1998) (unpublished opinion) (summary judgment granted against interference-with-contractual-relations claim in absence of evidence that defendant acted out of malice rather than to protect its own financial interest).

Like the district court, I would conclude that, absent speculation, there is no evidence that Oak Park Mall intended to injure M West by denying approval of the lease assignment. Oak Park Mall's comments of liking the idea of a potential lease assignment to M

West and that the agreement sounded "fine" do not demonstrate malice. Oak Park Mall was within its rights when it encouraged the potential agreement between Cingular and M West, waited to see whether that offer comported with its own business needs, and then negotiated with Cingular for an outcome that would better meet Oak Park Mall's business interests. I would therefore affirm the district court's grant of summary judgment to Oak Park Mall.