NOT DESIGNATED FOR PUBLICATION

No. 124,971

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

AMANDA DULING,
*Appellee,*

v.

MID AMERICAN CREDIT UNION,
*Appellant.*

MEMORANDUM OPINION

Appeal from Sedgwick District Court; DEBORAH HERNANDEZ MITCHELL, judge. Opinion filed December 16, 2022. Affirmed.

*Benjamin A. Ramberg*, and *John G. Schultz*, of Franke Schultz & Mullen, P.C., of Kansas City, Missouri, for appellant.

*Anthony A. Orlandi*, of Branstetter, Stranch & Jennings, PLLC, of Nashville, Tennessee, pro hac vice, and *Richard S. Fisk*, of Beam-Ward, Kruse, Wilson & Fletes, LLC, of Overland Park, for appellee.

Before GARDNER, P.J., WARNER and COBLE, JJ.

PER CURIAM: Mid American Credit Union (MACU) appeals the denial of its motion to compel arbitration in a putative class action that Amanda Duling, a MACU member, filed against it. MACU argues that it acted according to the "change [of] term" provision in the parties' contract by unilaterally adding arbitration and class action waiver provisions to Duling's membership agreement and that Duling accepted the arbitration provision by continuing to use her account. Finding no reason to overrule the district court's negative finding against MACU, we affirm.

1

*Factual and Procedural Background*

Duling opened an account with MACU in 2018. The terms of the contract that Duling signed to open this account—her membership agreement—included an "Amendments and Termination" section. This section outlined MACU's authority to change the terms of the agreement:

> "We may change our bylaws and any term of this agreement. Rules governing changes in rates are provided separately in the Truth-in-Savings disclosure or in another document. For other changes we will give you reasonable notice in writing or by any other method permitted by law. . . . Reasonable notice depends on the circumstances, and in some cases such as when we cannot verify your identity or we suspect fraud, it might be reasonable for us to give you notice after the change or account closure becomes effective. For instance, if we suspect fraudulent activity with respect to your account, we might immediately freeze or close your account and then give you notice. . . . If we have notified you of a change in any term of your account and you continue to have your account after the effective date of the change, you have agreed to the new term(s)."

Her membership agreement included notice requirements for amendments:

> "Any written notice you give us is effective when we actually receive it, and it must be given to us according to the specific delivery instructions provided elsewhere, if any. We must receive it in time to have a reasonable opportunity to act on it. If the notice is regarding a check or other item, you must give us sufficient information to be able to identify the check or item, including the precise check or item number, amount, date and payee. Written notice we give you is effective when it is deposited in the United States Mail with proper postage and addressed to your mailing address we have on file. Notice to any of you is notice to all of you."

The membership agreement included no provision mentioning arbitration or class actions.

*Notice of Arbitration Provisions*

In a cover letter dated December 7, 2020, MACU notified its members that it would be adding a new arbitration provision to their membership agreements:

"Thank you for your continued loyalty to Mid American Credit Union. As a member owned financial co-operative we are always mindful that it is our duty to protect credit union resources. As good stewards it is imperative that we stay up to date with all regulatory and legal requirements placed upon the credit union.

"Because of this ongoing duty we are adopting a new Arbitration of Claims and Disputes and Waiver of Class Action provision. This new provision will provide more clarity as to how legal disputes between the credit union and its members shall be resolved. We are making this change as a way to protect our member owners and the Credit Union through the parties working together to resolve disputes. This new Arbitration and Class Action Waiver provision will become effective on December 28, 2020."

MACU attached to its cover letter a copy of the arbitration and class action provision, which stated that, with limited exceptions, MACU or its members could force "any disputes" about a member's account to be "resolved by binding arbitration." And once effective, the provision would preclude class actions or the joinder of parties to such disputes.

*Opt-out Language in Cover Letter and Arbitration Provision*

MACU's cover letter stated that the arbitration provisions would become effective on December 28, 2020, that members would have until January 6, 2021, to opt out, and that continued use by a member who did not opt out would be treated as consent:

"This new Arbitration and Class Action Waiver provision will become effective on December 28, 2020. You will have until January 6, 2021 to exercise your right to opt out

3

of this provision. If you do not opt out of this provision, then your continued use or maintenance of your credit union account will act as your consent to this new provision."

The cover letter also stated that "[i]nstructions on how to opt out are included in the new provision provided with this letter." But those instructions on how to opt out stated a different opt-out date than the cover letter's January 6, 2021 opt-out date. Under the heading "Right to Reject this Resolution of Disputes by Arbitration provision," rather than stating any date certain, the new arbitration provision explained that MACU members could opt out by sending written notice to MACU's address within 30 days of the opening of the member's account or the mailing of the notice, "whichever is sooner":

> "You have the right to opt out of this agreement to arbitrate if you tell us within 30 days of the opening of your account or the mailing of this notice, whichever is sooner. To opt out, send us written notice that you reject the Resolution of Disputes by Arbitration provision, including your name as listed on your account and your account number to the following address: Mid American Credit Union, 8404 West Kellogg Drive, Wichita, KS 67209-1845[.]
>
> "Otherwise, this agreement to arbitrate will apply without limitation, regardless of whether 1) your account is closed; 2) you pay us in full any outstanding debt you owe; or 3) you file for bankruptcy."

*Duling's Initiation of a Class Action*

In October 2021, Duling filed a putative class action petition alleging MACU had breached its contract, violated the Kansas Consumer Protection Act, and unjustly enriched itself. Duling's petition alleged that MACU had improperly assessed or collected insufficient funds fees from her and other MACU members.

In addition to filing an answer, MACU moved to stay all legal proceedings and to compel arbitration or, alternatively, to dismiss. MACU attached to its motion a copy of

the December 7 cover letter and argued that Duling was contractually required to resolve her dispute through arbitration, since she had not opted out by January 6, 2021.

Duling responded that she had received no letter or notice about MACU adding an arbitration provision. Duling also argued that the cover letter—which MACU had attached as an exhibit to its response—insufficiently established that MACU had sent notice on or after the date listed because the cover letter was unsigned, was not on MACU's letterhead, and was unaccompanied by a copy of the arbitration provision that it alluded to. Duling also claimed that the cover letter was false or misleading.

MACU replied to Duling's contentions, attaching several exhibits:

- a copy of the cover letter dated December 7, 2020;
- an affidavit from MACU's President/CEO (Brad Herzet), attesting that MACU had mailed all members the cover letter and a copy of the arbitration provision on December 7, 2020; and
- a copy of a mailing invoice, dated December 16, 2020, listing the units and total price of several "Class Action Change Items," which included, among other things, an "all member cover letter" and a "change letter."

At the hearing on MACU's motion to compel arbitration, MACU argued that:

- the cover letter was an offer, clearly indicating that Duling had until January 6, 2021, to opt out of the provisions;
- because Duling continued to use her credit account after that date, she accepted the terms of the provision—thus forming a binding arbitration agreement;
- Duling's continued use of her account was an "affirmative act" of acceptance that fell outside the general rule precluding acceptance of a contract by silence;

5

- no "mutual consent" was required because Kansas recognizes "unilateral contracts"; and

- the arbitration and class action provisions were not "adding a new term" to the parties' contracts but were simply "a change to the agreement," citing the "legal actions affecting your account" and "resolving account disputes" sections of Duling's membership agreement.

The district court denied MACU's motion to compel arbitration. Although it noted that public policy favored arbitration, the district court determined that the parties had not entered into a valid arbitration agreement. Instead, the court found the arbitration and class action provisions were "new terms not contemplated by the initial agreement." The court explained that "[a]lthough the initial agreement . . . mention[ed] claims disputed, the entire waiver of methods of pursuing claim[s] exceeds a mere change and, essentially, [was] a new provision."

The district court also found that MACU's notice "indicate[d] the opt-out time had already lapsed." Because the arbitration provision stated that the time to opt out ended 30 days after Duling opened her account—the earlier of the two dates—"she may have seen the opt-out provision as futile as more than 30 days had passed since she opened her account." Rejecting MACU's claim that the "whichever is sooner" language was simply printed incorrectly, the district court construed the language against MACU as the drafter. Finding no facts showing mutual consent to arbitrate, the district court denied MACU's motion.

MACU timely appeals.

We note that Duling also briefs several issues on appeal, as if she had appealed. She challenges the sufficiency of MACU's notice, alleging that MACU failed to prove that it mailed the notice or that she received it. She contends that MACU's cover letter

6

was not a legal document, so it did not convey a legal offer. And she claims that MACU could not unilaterally add an arbitration clause to the agreement without breaching the implied duties of good faith and fair dealing. True, these are matters generally considered when determining contract formation. But Duling's claims are not properly raised here because the district court did not make the factual findings necessary for us to review these arguments and Duling failed to object to any inadequacy in the district court's factual findings. *State v. Jones*, 306 Kan. 948, 959, 398 P.3d 856 (2017) ("When there is no objection to a trial court's findings, this court presumes that the trial court found all facts necessary to support its judgment."). Nor did Duling cross-appeal from any adverse ruling entered against her in the district court. *Lumry v. State*, 305 Kan. 545, 553-54, 385 P.3d 479 (2016) (noting K.S.A. 60-2103(h)'s requirement that an appellee file a notice of cross-appeal from adverse rulings to obtain appellate review of those issues). We thus decline to reach the issues Duling raises.

*Did the District Court Err by Denying MACU's Motion to Compel Arbitration?*

MACU challenges the district court's findings that, per the terms of the parties' contract, it could not add an arbitration clause to the agreement, and that it failed to prove mutual consent. MACU contends that it could add the arbitration clause to the agreement under its change of terms provision. Alternatively, MACU claims that the cover letter was a valid offer to modify the terms of the parties' initial agreement "under basic notions of contract law." It adds that in either instance, the undisputed facts establish that Duling affirmatively consented to the change by continuing to use her account after failing to opt out.

*Legal Principles Guiding Our Decision*

The district court properly exercised its authority to decide whether an agreement to arbitrate existed, and its decision is a final and appealable order. See *Anderson v.*

7

*Dillard's, Inc.*, 283 Kan. 432, 435, 153 P.3d 550 (2007); *NEA-Topeka v. U.S.D. No. 501*, 260 Kan. 838, 841, 925 P.2d 835 (1996). "An appellate court reviews an alleged arbitration agreement like any other contract, applying a de novo standard of review." *Anderson*, 283 Kan. at 436. This court is not bound by the district court's interpretations of a written instrument. *Trear v. Chamberlain*, 308 Kan. 932, 936, 425 P.3d 297 (2018).

"The primary rule for interpreting written contracts is to ascertain the parties' intent. If the terms of the contract are clear, the intent of the parties is to be determined from the language of the contract without applying rules of construction." *Anderson*, 283 Kan. at 436.

> "An interpretation of a contractual provision should not be reached merely by isolating one particular sentence or provision, but by construing and considering the entire instrument from its four corners. The law favors reasonable interpretations, and results which vitiate the purpose of the terms of the agreement to an absurdity should be avoided." *Johnson County Bank v. Ross*, 28 Kan. App. 2d 8, 10-11, 13 P.3d 351 (2000).

The Supreme Court recently clarified that

> "an arbitration agreement is 'a specialized kind of forum-selection clause that posits not only the situs of suit but also the procedure to be used in resolving the dispute.' An arbitration agreement thus does not alter or abridge substantive rights; it merely changes how those rights will be processed. And so . . . '"[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral . . . forum."' [Citations omitted.]" *Viking River Cruises, Inc. v. Moriana*, 596 U.S. ___, 142 S. Ct. 1906, 1919, 213 L. Ed. 2d 179 (2022).

Kansas courts generally favor arbitration agreements. *Coulter v. Anadarko Petroleum Corp.*, 296 Kan. 336, 370, 292 P.3d 289 (2013). And courts generally seek to uphold arbitration agreements even when the contract provisions are somewhat unclear and indefinite. *City of Lenexa v. C.L. Fairley Const. Co.*, Inc., 245 Kan. 316, 319, 777

P.2d 851 (1989); *Hemphill v. Ford Motor Co.*, 41 Kan. App. 2d 726, 735, 206 P.3d 1 (2009). But a party cannot be required to arbitrate a particular dispute without an agreement to arbitrate. K.S.A. 5-429(c); *AT & T Technologies, Inc. v. Communications Workers*, 475 U.S. 643, 648, 106 S. Ct. 1415, 89 L. Ed. 2d 648 (1986); see *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 n.2, 133 S. Ct. 2064, 186 L. Ed. 2d 113 (2013) (explaining whether an arbitration agreement exists is a "gateway matter[]"); but see *Franklin v. Sunflower Imports, Inc.*, No. 95,299, 2006 WL 3257461, at *3 (Kan. App. 2006) (noting contrary authority suggesting federal policy favoring arbitration might apply to the determination of whether there is a valid agreement to arbitrate).

Whether the parties agreed to arbitrate is determined by contract law. See *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943-45, 115 S. Ct. 1920, 131 L. Ed. 2d 985 (1995); *Heartland Premier, LTD v. Group B & B, L.L.C.*, 29 Kan. App. 2d 777, Syl. ¶ 3, 31 P.3d 978 (2001). And under Kansas law, whether a binding contract has been formed depends on the intention of the parties and is a question of fact. *Reimer v. Waldinger Corp.*, 265 Kan. 212, 214, 959 P.2d 914 (1998). An appellate court generally reviews a district court's finding that a contract exists for substantial competent evidence. *Price v. Grimes*, 234 Kan. 898, 904, 677 P.2d 969 (1984); *Source Direct, Inc. v. Mantell*, 19 Kan. App. 2d 399, 407, 870 P.2d 686 (1994). Similarly, whether a particular term of a written contract has been modified or waived by a later agreement is a question of fact for the trial court. *Thoroughbred Assocs. v. Kansas City Royalty Co.*, 297 Kan. 1193, 1209, 308 P.3d 1238 (2013).

Still, as the party moving to compel arbitration, MACU had the "initial summary-judgment-like burden" of presenting enough evidence to show an enforceable agreement to arbitrate. See *Unified School Dist. #503, Parsons, Kansas v. R.E. Smith Const. Co.*, No. 07-2423-GLR, 2008 WL 2152198, at *2 (D. Kan. 2008). The district court found that MACU failed to meet this burden, which is a negative finding. See *Mohr v. State Bank of Stanley*, 244 Kan. 555, 567, 770 P.2d 466 (1989) ("A finding that the plaintiff did not

9

sustain the burden of proof is a negative finding."); see also *Short v. Sunflower Plastic Pipe, Inc.*, 210 Kan. 68, 74-75, 500 P.2d 39 (1972) (applying negative finding test when reviewing trial court's order finding that a contract did not exist). Under these circumstances, this court applies an "even more deferential standard of review." *Woodard v. Hendrix*, No. 123,900, 2022 WL 2286922, at *5 (Kan. App. 2022) (unpublished opinion) (citing *Cresto v. Cresto*, 302 Kan. 820, 845, 358 P.3d 831 [2015]). We thus accept the district court's factual findings unless the party challenging the finding proves that the district court arbitrarily disregarded undisputed evidence or relied on some extrinsic consideration such as bias, passion, or prejudice to reach its decision. *State v. Douglas*, 309 Kan. 1000, 1002-03, 441 P.3d 1050 (2019).

A binding contract typically entails an offer of terms, an acceptance of those terms, and consideration or a thing of value passing from each party to the other. *M West, Inc. v. Oak Park Mall*, 44 Kan. App. 2d 35, 49, 234 P.3d 833 (2010) (noting that offer, acceptance, and consideration constitute "all the components of a valid contract"). The parties must each accept the essential terms of the contract and outwardly communicate that acceptance in a way reasonably intended to be understood as such. *Southwest & Assocs. Inc. v. Steven Enterprises*, LLC, 32 Kan. App. 2d 778, 781, 88 P.3d 1246 (2004); see also *Morales v. Sun Constructors, Inc.*, 541 F.3d 218, 221 (3d Cir. 2008) ("Acceptance is measured not by the parties' subjective intent, but rather by their outward expressions of assent."). "The parties' mutual promises to arbitrate constitute sufficient consideration under Kansas law." *Clutts v. Dillard's, Inc.*, 484 F. Supp. 2d 1222, 1224 n.1 (D. Kan. 2007).

Kansas contract law defines the assent necessary to form a contract as a "meeting of the minds," i.e., "[a]n unconditional and positive acceptance." *USD 446 v. Sandoval*, 295 Kan. 278, 282, 286 P.3d 542 (2012). "To constitute a meeting of the minds there must be a fair understanding between the parties which normally accompanies mutual consent and the evidence must show with reasonable definiteness that the minds of the

parties met upon the same matter and agreed upon the terms of the contract." *Steele v. Harrison*, 220 Kan. 422, Syl. ¶ 3, 552 P.2d 957 (1976). When a "purported contract is so vague and indefinite that the intentions of the parties cannot be ascertained, it is unenforceable." *Mohr*, 244 Kan. at 573.

In determining whether a contract was formed, we require only reasonable certainty as to the terms of the agreement. *Mohr*, 244 Kan. at 573. A contract will not fail for uncertainty or indefiniteness if the court can determine the terms by which the parties intended to be bound and carry out their intentions. *Holley v. Allen Drilling Co.*, 241 Kan. 707, 710, 740 P.2d 1077 (1987). Moreover, courts will generally "seek to uphold arbitration agreements even where the contract provisions are somewhat uncertain and indefinite." *Heartland Premier, LTD*, 29 Kan. App. 2d at 780.

*Analysis*

We assume, without deciding, that MACU properly sent notice to Duling of its new arbitration provision.

We first address MACU's argument that its membership agreement with Duling and others permitted it to unilaterally add the arbitration clause. We then address its alternative argument that its December 7 letter was an offer to modify the initial agreement which Duling accepted by her continued use of her account.

*Agreement Did Not Contemplate Addition of an Arbitration Provision*

MACU cites *Rupe v. Triton Oil & Gas Corp.*, 806 F. Supp. 1495, 1502 (D. Kan. 1992), stating a "right" to unilaterally change the terms of a contract is "generally available only to those who expressly provide for this right in the agreement." MACU contends that its change of terms provision does so. The change of terms provision in the

11

parties' membership agreement provides that MACU "may change [its] bylaws and any term of th[e] agreement." That same paragraph states, "[i]f we have notified you of a change in any term of your account and you continue to have your account after the effective date of the change, you have agreed to the new term(s)."

The district court found that other provisions of the membership agreement merely "mention[ed] claims disputed" and did not contemplate arbitration. We agree. MACU cites several provisions of its agreement with Duling that allegedly show the parties contemplated arbitration. See *Follman v. World Fin. Network Nat. Bank*, 721 F. Supp. 2d 158, 166 (E.D.N.Y 2010). These provisions are titled "agreement," "liability," and "resolving account disputes." Yet MACU fails to explain how or where any language in these sections points to arbitration. Having reviewed these provisions, we cannot reasonably conclude that any of them do so. They do not elect or discuss dispute resolution methods or forums—they merely suggest that disputes could arise and would be resolved under relevant state and federal laws. Without more, we cannot find that the contract specifically contemplated arbitration or the addition of an arbitration agreement under any of its provisions. See *TMG Life Ins. Co. v. Ashner*, 21 Kan. App. 2d 234, 244, 898 P.2d 1145 (1995) (reviewing court will not create a contract term that the drafter of the contract could have but failed to include); see also *Bellman v. i3Carbon, LLC*, 563 Fed. Appx. 608, 613-15 (10th Cir. 2014) (reviewing several documents for an agreement to arbitrate but finding no such evidence based in part on lack of mention of arbitration in signed agreement).

The district court also held that MACU's attempt to add the new arbitration provision was not a "change" to "any term of the agreement"—as permitted by the membership agreement. Its decision reflected other court's findings that "[t]here is a clear distinction between amending the financial terms and rates of a credit card agreement and the unilateral addition of [a] new provision not contemplated at the time of the original agreement." *Discover Bank v. Shea*, 362 N.J. Super. 200, 211, 827 A.2d 358 (2001). See

12

*Badie v. Bank of America,* 67 Cal. App. 4th 779, 79 Cal. Rptr. 2d 273 (1998) (finding that credit issuer cannot impose binding arbitration on its cardholders through "bill stuffer" stating that continued use of card constitutes acceptance).

MACU shows us no terms of the membership agreement that the arbitration provision would change. Rather, it offers dictionary definitions of "change" and suggests that the word broadly includes the ability to add something new. And it cites Mississippi federal district court cases determining that the term "change" allowed a bank to unilaterally modify a preexisting agreement by mailing its members notice of a new provision. See *Beneficial Nat. Bank, U.S.A. v. Payton*, 214 F. Supp. 2d 679, 687 n.9 (S.D. Miss. 2001) (noting "Black's Law Dictionary [6th ed.] defines 'change' to include '[a]n alteration; a modification or addition; substitution of one thing for another.'"); *Herrington v. Union Planters Bank, N.A.*, 113 F. Supp. 2d 1026, 1030 (S.D. Miss. 2000), *aff'd sub nom. Herrington v. Union Planters Bank*, 265 F.3d 1059 (5th Cir. 2001) (same, and also noting Webster's International Dictionary 1944 [3d ed. 1981] defines "revise" as "to make a new, amended, improved, or up-to-date version of"). Kansas law may reflect that broad interpretation. See, e.g., *Griffin ex rel. Green v. Suzuki Motor Corp.*, 280 Kan. 447, 460, 124 P.3d 57 (2005) (finding that the phrase "change in design" encompassed a "'wholly different design'").

We assume, without deciding, that the change of terms provision in Duling's agreement with MACU empowered MACU to add new terms to the parties' agreement, including an arbitration requirement. Still, the membership agreement does not give MACU unlimited authority to change it unilaterally. Rather, the change of terms section first requires MACU to give members reasonable notice of the changes it intends to make to the terms, and it then gives members the option to agree to those changes by continuing to accept MACU's services or to reject the changes by notifying MACU. The members' ability to accept or reject notified changes in MACU's terms of service prevents the contract from being illusory. See *Flood v. ClearOne Communications, Inc.*, 618 F.3d

13

1110, 1119-1120 (10th Cir. 2010) (An illusory promise is but a "façade" that imposes no performance obligations on the promisor and affords no consideration to the promisee.); *CIT Group v. E-Z Pay Used Cars, Inc.*, 29 Kan. App. 2d 676, 678-79, 32 P.3d 1197 (2001) ("a contract which purports to promise a specified performance but allows one party the discretion to determine whether to perform is only an illusory contract and unenforceable"). Thus the notice and opt-out provisions prevent MACU from unilaterally adding terms to the agreement that were not contemplated by the original agreement. Rather, an offer, acceptance, and consideration are necessary. In other words, mutuality remains necessary.

Under Kansas law, a party to a contract cannot unilaterally change the terms of the agreement. *Guy Pine, Inc. v. Chrysler Motors Corp.*, 201 Kan. 371, 376, 440 P.2d 595 (1968); *Thoroughbred Associates, L.L.C. v. Kansas City Royalty Co., L.L.C.*, 58 Kan. App. 2d 306, 317, 469 P.3d 666 (2020). The terms of a written contract may, however, be "'varied, modified, waived, annulled, or wholly set aside, by any subsequently executed contract, whether such subsequently executed contract be in writing or in parol.'" *Coonrod & Walz Const. Co. v. Motel Enterprises, Inc.*, 217 Kan. 63, 73, 535 P.2d 971 (1975).

Mutuality is required to amend the terms of a contract. *Gill Mortuary v. Sutoris, Inc.*, 207 Kan. 557, 562, 485 P.2d 1377 (1971). With some exceptions, the agreement to modify may be express or implied from the parties' conduct. See *Fast v. Kahan*, 206 Kan. 682, 685-686, 481 P.2d 958 (1971) (although the contract included provisions for determining amount of partners' annual settlement, partners adopted another means to determine annual settlement, and so modified contract by their conduct); *Wachter Mgmt. Co. v. Dexter & Chaney, Inc.*, 282 Kan. 365, Syl. ¶¶ 3, 5, 144 P.3d 747 (2006) (applying Uniform Commercial Code's rule requiring express assent to amendment that materially changed contract terms by adding "shrinkwrap" license agreement). The new arbitration provision MACU proposed was a material change to the membership agreement.

14

We view MACU's letter as an offer for Duling to modify her membership agreement. See *Wachter Management Co.*, 282 Kan. 365, Syl. ¶ 3 (treating a shrinkwrap software licensing agreement not included in the parties' original contract as a request to amend the contract). The crucial question thus becomes whether Duling accepted the arbitration agreement by failing to opt out.

*Insufficient Showing of Assent*

The crux of the district court's ruling and the parties' claims on appeal centers on the assent issue. "[A]ssent is as much a requisite in effecting a modification as it is in the initial creation of a contract. . . . In either case . . . there must be a meeting of the minds with respect to the proposed modification. [Citations omitted.]" *Kahan*, 206 Kan. at 684-85.

To establish a meeting of the minds, the terms of the parties' agreement must be complete and definite enough that each party reasonably understands the rights and obligations created. *Jack Richards Aircraft Sales, Inc. v. Vaughn*, 203 Kan. 967, 971, 457 P.2d 691 (1969). To be considered binding, the contract's terms must also be definite enough that a court may "determine what acts are to be performed and when performance is complete." *Lessley v. Hardage*, 240 Kan. 72, Syl. ¶ 4, 727 P.2d 440 (1986).

It is generally accepted, as MACU concedes, that the offeror controls the handling of the offer. The offer determines who may accept and how. See Restatement (Second) of Contracts § 30, cmt. a (2022) (explaining "offeror is entitled to insist on a particular mode of manifestation of assent. The terms of the offer may limit acceptance to a particular mode; whether it does so is a matter of interpretation."); *Wachter Mgmt. Co.*, 282 Kan. at 377-78 (observing that under Kansas law, "[t]he offeror, whether the seller or the buyer, is the master of the offer," adhering to "the traditional contract principles"). That rule applies here.

The parties also agree that generally, silence will not be construed as acceptance. See *Caterpillar Tractor Co. v. Sickler*, 149 Kan. 457, 460, 87 P.2d 503 (1939); See also Restatement (Second) of Contracts § 69, cmt. a (2022) ("Acceptance by silence is exceptional" because "[o]rdinarily an offeror does not have power to cause the silence of the offeree to operate as acceptance. . . . The mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction or impose on him any duty to speak."); *PCS Nitrogen Fertilizer, L.P. v. Christy Refractories*, L.L.C., 225 F.3d 974, 981 (8th Cir. 2000) (insufficient proof of course of dealing to integrate an arbitration provision into the contract when the buyer did not expressly assent to the term); *Locklear Automotive Group, Inc. v. Hubbard*, 252 So.3d 67, 85 (Ala. 2017) (assent to arbitrate typically manifested by signing the contract containing an arbitration provision).

Yet the parties still disagree as to what constitutes acceptance. According to MACU, Duling accepted its offer to amend the initial agreement by not electing to exercise her right to opt out and by then continuing to use her account. Despite recognizing its inconsistent language in the arbitration provision, particularly the "whichever is sooner" phrase, MACU argues that when read with the December 7th cover letter, members should have reasonably known that their last opt-out date was January 6, 2021.

To the contrary, Duling maintains that the district court correctly found that her time to opt out ended 30 days after she opened her account. Because she opened her account years before MACU mailed the cover letter and notice of the new arbitration provision, her 30 day opt-out period expired long before she got that letter. Duling thus asserts that "[n]ot doing something that is impossible" does not evidence assent. Duling also argues that the cover letter does not resolve confusion but rather creates two ambiguities:  (1) it states a different deadline for opting out than the one contained in the instructions for opting out; and (2) that the arbitration provision would become effective

16

on a date before the January 6, 2021 cut-off date for opting out, and thus her use of the account even one day after the letter was mailed would be viewed as acceptance.

The parties each cite factually similar cases supporting their desired result, and we have found many on each side. MACU cites two cases in which the district court approved of general procedures much like those that MACU followed here. Noting the opt-out provisions when considering assent, the courts found that the members' acts of not opting out and continuing to use their accounts showed their intent to be bound. See *Gillam v. Branch Banking and Trust Co. of Va.*, No. 3:17-cv-722, 2018 WL 3744019, at *3 (E.D. Va. 2018) (unpublished opinion) and *Valle v. ATM Nat., LLC*, No. 14-cv-7993, 2015 WL 413449, at *1, *3 (S.D.N.Y. 2015) (unpublished opinion).

In contrast, Duling cites two cases which considered the same "whichever is sooner" language MACU used in its new arbitration provision instructions. In both cases, the courts refused to compel arbitration, rejecting the credit unions' attempted unilateral addition of arbitration clauses and their ineffective attempt to bind members by the confusing opt-out language. One case is apparently pending on appeal. See *Pruett v. WESTConsin Credit Union*, No. 2021CV0000158 (Wis. Cir. Ct. Apr. 11, 2022). The other has recently been reversed. See *Canteen v. Charlotte Metro Credit Union*, No. 21-CVS-6056, n. 36 (Mecklenburg Cnty. N.C. Super. Ct. Sept. 1, 2021), rev'd No. COA22-59, 2022 WL 17420000 (N.C. App. 2022) (finding the facts show a binding arbitration agreement).

Assent is decided case-by-case, so caselaw considering whether a party agreed to arbitration encompasses many factual scenarios. See, e.g., *Rudolph v. Wright Patt Credit Union*, 175 N.E.3d 636, 649 (Ohio Ct. App. 2021) (finding arbitration agreement added to existing contract valid when the contract mentioned dispute resolution and customer continued using their account after receiving notice, even though no right to opt out was provided). But a common factor among cases finding sufficient assent is a clear and

17

specific offer. And when acceptance does not require a specific act, the offeror's inclusion of both a clearly drafted opt-out requirement and a warning that the customer's continued use will be construed as assent strengthens the support for assent. See, e.g, *AT & T Mobility Services LLC v. Inzerillo*, No. 4:17-cv-00841-HFS, 2018 WL 10160964, at *3 (W.D. Mo. 2018) (finding assent where consumer employee failed to opt out and continued working for company).

Failure to opt-out of an arbitration program can, of course, constitute acceptance. For example, in *Rittenhouse v. GlaxoSmithKline*, CV No. 21-1836, 2021 WL 6197361, at *3-4 (E.D. Pa. 2021), it was undisputed that an employee received several emails with links, notifying her about adding an arbitration agreement and instructing her how to opt out. When the employee claimed that she had not assented to the agreement, the court rejected her argument in these well-reasoned terms:

> "[An] argument that by 'doing nothing' in response to GSK's communications about the arbitration agreement she did not assent to the arbitration agreement is equally unpersuasive. An employee's failure to opt-out of a voluntary arbitration program constitutes acceptance, especially where failure to opt-out is the exact form of acceptance invited by the offer. See, e.g., *Stephenson*, 2021 WL 3603322, at *6; *Bracy*, 2020 WL 1953647, at *7; *Hoffman v. Compassus*, 2019 WL 1791413, at *6 (E.D. Pa. Apr. 23, 2019). This is because '[a]cceptance is measured not by the parties' subjective intent, but rather by their outward expressions of assent.' *Morales*, 541 F.3d at 221. Thus, if an offeree, 'acts or expresses itself as to justify the other party in inferring assent, and this action or expression was of such a character that a reasonable person in the position of the offeree should have known it was calculated to lead the offeror to believe that the offer had been accepted, a contract will be formed' (Citations omitted.)" 2021 WL 6197361, at *4.

We agree that acceptance is measured not by the parties' subjective intent, but by their outward expressions of assent. Because the offer controls the manner of acceptance, an offer with clearer and more specific terms provides a better basis from which we may

find an outward expression of assent and thus a binding contract. This is true even in cases like this one, which include opt out and continued use of account terms.

MACU's offer, however, failed to provide sufficient clarity to reasonably convey to its members what was required for their assent or for their refusal. We agree with Duling that the date MACU stated by which members needed to opt out was unclear. The arbitration agreement explained:  "You have the right to opt out of this agreement to arbitrate if you tell us within 30 days of the opening of your account or the mailing of this notice, whichever is sooner." But to the contrary, the cover letter stated:  "You will have until January 6, 2021 to exercise your right to opt out of this provision." MACU contends that because Duling first opened her account with it in 2018, the date that was "sooner" for her was 30 days after the mailing of the December 7th notice, or January 6, 2021. Yet it fails to explain this interpretation, and none is apparent to us. MACU apparently interprets "sooner" to mean closer in time *after* receipt of the notice, or in the near future. But the district court accepted Duling's interpretation that "whichever is sooner" meant whichever date was *earlier* chronologically.

Because the relevant documents do not define "sooner," we resort to the general principle that ordinary words are presumed to carry their ordinary, natural, common meanings. See *State v. Sandoval*, 308 Kan. 960, 963, 425 P.3d 365 (2018). And we find that the common meaning of the word "sooner" arguably supports both MACU's and Duling's conflicting interpretations. See Webster's New World College Dictionary 1386 (5th ed. 2020) (defining "sooner" to mean "in a short time (after a time specified or understood)"; and also to mean "ahead of time; early"). Reading the word in context provides no clarity.

So even if we assume that the cover letter can constitute a legal offer, we still find confusion because we must consider its terms along with those in the arbitration provision. See *Waste Connections of Kansas, Inc. v. Ritchie Corp.*, 296 Kan. 943, 963,

19

298 P.3d 250 (2013) (We interpret contracts by construing and considering entire instrument from its four corners—not by isolating one sentence or provision.). True, the cover letter clearly states the January 6, 2021 opt-out date. But that letter cannot be read in isolation—we must read it together with the opt-out instructions in the arbitration provision, which the cover letter referenced, and those instructions produce uncertainty and confusion. Having reviewed those instructions, we find it genuinely uncertain not only which document controls the opt-out date, but also what the opt-out-date is supposed to be according to the arbitration instructions. In short, we cannot tell what the opt-out deadline was. Ambiguity arises when "the face of the instrument leaves it genuinely uncertain which one of two or more meanings is the proper meaning." *Catholic Diocese of Dodge City v. Raymer*, 251 Kan. 689, 693, 840 P.2d 456 (1992); *Kincaid v. Dess*, 48 Kan. App. 2d 640, 647, 298 P.3d 358 (2013). The opt-out provision is thus ambiguous.

MACU counters that reading the text of the December 7th notice in harmony with the opt-out provision resolves any arguable ambiguity. It reasons:

- "The December 7th notice stated, '[y]ou will have until January 6, 2021 to exercise your right to opt out of this provision.'";
- "30 days after December 7, 2020, is January 6, 2021";
- "Thus when Duling received the December 7th notice, …[s]he had '30 days from the mailing of the' December 7th notice," which the cover letter clearly stated was January 6, 2021.

But this interpretation ignores language that MACU expressly included in the arbitration agreement, italicized below, that members could opt out of the arbitration agreement by informing MACU of that decision "*within 30 days of the opening of your account* or the mailing of this notice, *whichever is sooner*." What this latter clause was intended to mean, in context, remains a mystery. Yet one reasonable interpretation is that the opening of Duling's account in 2018 is sooner than any date in 2021.

20

We interpret ambiguous language in a written document against the drafter. See *Liggatt v. Employers Mut. Casualty Co.*, 273 Kan. 915, 921, 46 P.3d 1120 (2002). This is particularly so in cases involving adhesion contracts—ambiguities should be interpreted most strongly against the party who drafted the agreement. See *Badie*, 67 Cal. App. 4th at 798; see also *Anderson v. Union Pacific R.R. Co.*, 14 Kan. App. 2d 342, 346, 790 P.2d 438 (1990) (citing Black's Law Dictionary 38 [5th ed.1979], defining contract of adhesion as a "[s]tandardized contract form offered to consumers of goods and services on essentially 'take it or leave it' basis without affording consumer realistic opportunity to bargain and under such conditions that consumer cannot obtain desired product or services except by acquiescing in form contract"); *Kortum-Managhan v. Herbergers NBGL*, 2009 MT 79, ¶ 23, 349 Mont. 475, 482, 204 P.3d 693 (2009) (finding arbitration agreement was a contract of adhesion and considering whether terms were "'within [weaker parties'] reasonable expectations, or . . . unduly oppressive unconscionable or against public policy.' [Citations omitted.]").

Construing the opt-out provisions against MACU, we find that MACU failed to show Duling assented to its offer to add an arbitration clause to her membership agreement by her continued use of her account after receiving notice of the ambiguous opt-out date. Duling's failure to opt out and her continued use of her account thus did not justify MACU in inferring her assent. Nor was Duling's act of such a character that a reasonable person in her position should have known it was calculated to lead MACU to believe that the offer had been accepted. When a "purported contract is so vague and indefinite that the intentions of the parties cannot be ascertained, it is unenforceable." *Mohr*, 244 Kan. at 573. Such is the case here. MACU's new arbitration agreement is unenforceable because its opt-out provisions are too vague and indefinite for us to find that Duling assented to the new arbitration agreement by continuing to use her account.

Affirmed.

21